# APPENDIX

In Re RURAL CREDITS LAW.

In Re Opinion of the Judges.

(162 N. W. 536.)

(Opinion filed May 7, 1917.)

1. **Courts—Supreme Court—Judicial Power, Exercise of—Governor's Request for Advisory Opinion—"Important Questions of Law" as Occasion for Opinion.**

   The advisability of appointing members of the board to administer the Rural Credits Law (Laws 1917, Chaps. 333, 334), and of incurring expenses incident to its organization and compensation, depending, as it does, upon the proper answer that may be made to certain questions propounded to the Supreme Court by the Governor, render such questions "important questions of law involved in the exercise of his executive powers," and there is thereby presented an occasion authorizing the Governor to call upon the Judges of said Court for their opinions upon such questions.

2. **Constitutional Law—Judicial Power—Peoples' Compact to Conform to Fundamental Law, Court's Duty to Enforce Recognition by People's Representatives.**

   While, unless they have surrendered some part of their sovereignty, there is vested and remains in a sovereign people plenary power, yet, when such a people enter into compact with one another that the laws governing their relations shall conform to certain fundamental rules and principles, the Court's duty is to see that the compact is lived up to by the peoples' representatives.

3. **Constitutional Law—State Debts, Limitation of—Amendment for Roads and Coal Supply, Whether Restricted by Debt Clauses, Etc.—Whether Rural Credits Amendment So Restricted?**

   The amendment to Const., Art. 1, Sec. 13, authorizing state to construct and maintain good roads and to supply coal to the people from state lands, is restricted, as is the power of the Legislature thereunder, in building of roads, etc., by the provisions of Art. 13, Sec. 2, limiting state indebtedness, and by Art. 11, Sec. 1, requiring preparation for an payment of such debt within ten years. Held, further, that the amendment to Art. 13, Sec. 1, so as to allow state to establish and maintain a system of rural credits whereby to loan money to the people upon realty security, etc., and Laws 1917, Chaps. 333, 334, creating a system of rural credits and for maintenance of

such system, etc., are likewise restricted by said other constitutional provisions relating to state indebtedness; that said sections concerning state indebtedness and its payment apply to legislation enacted under said amendments the same as they would have applied if such amendments had been part of the Constitution when first adopted.

4. **Constitutional Law—State Indebtedness—"Debt," Whether Included in Obligation Payable From Current Revenues?**

The word "debt," as used in Const., Art. 13, Sec. 2, limiting state indebtedness to a specified aggregate, and in Art. 11, Sec. 1, providing that "for the purpose of paying the public debt" the Legislature shall provide for levy of annual tax sufficient to pay annual interest and the principal of the debt within ten years, does not include a pecuniary obligation imposed by contract and which is to be satisfied out of current revenues for the year, or out of some fund then within immediate control of the state.

5. **Constitutional Law—Limitation of State Indebtedness—Borrowing Money on State Credit for Loaning on Realty, Taxation to Cover Deficiency, Whether Creative of "Debt."**

The Rural Credits Law (Laws 1917, Chap. 333) authorizing state to "borrow money on the good faith and credit of the state * * * , to be used in lending money on real estate," authorizing issuance of state bonds or warrants on which to borrow money necessary to make loans, declaring that interest rate on such loans shall be certain specified amounts more than the rate paid on the money so borrowed, declaring that the notes and mortgages taken by the rural credits board and lands, etc., acquired by it "shall be held in trust for the payment of moneys borrowed * * * and never shall be diverted to any other purpose," and which act contains no provision for levying any tax to meet payment of either principal or interest of such bonds or warrants as might be issued thereunder; and Chap. 334, providing that if there are not sufficient funds in treasury of said board to pay said bonds or warrants or interest thereon at maturity, the tax commission shall make special assessment and levy to pay same, and that all moneys derived from such levy, etc., shall be placed in a special fund and used only for such payments, do not create a debt within the meaning of Const., Art. 13, Sec. 2, limiting state indebtedness to a specified aggregate, or Art. 11, Sec. 1, requiring preparation for and payment of such debt within ten years; since said Chap. 334 does nothing more than designate a contingency under which a debt against the state will arise, which contingency is not a "debt" under the provisions of the Constitution; and moreover, under the provisions of the two acts, the securities required for loans made by said board, the oppor-

tunity given it to arrange so that maturity of loans will meet or antedate maturity of bonds and warrants, etc., such contingency is reduced to but a remote possibility.

McCoy, and Smith, JJ., concurring specially in the opinion.

Advisory opinion of the Supreme Court relative to Rural Credits Law; in response to request by the Governor of South Dakota.

To the Honorable the Judges of the Supreme Court of the State of South Dakota.

May it please Your Honors:

The people of the state of South Dakota, by their representatives in Legislature duly assembled, being desirous of providing in this state a system of rural credits, at the Fourteenth session submitted for the approval of the electors of the state a proposed amendment to section 1 of article 13 of the state Constitution by incorporating therein additional provisions in language as follows, to wit:

"Provided, further that the state or any county or two or more counties jointly may establish and maintain a system of rural credits and thereby loan money and extend credit to the people of this state upon real estate security in such manner and upon such terms and conditions as may be prescribed by general law."

And this constitutional amendment was at the general election held in this state on November 7, 1916, duly ratified.

Agreeable to the language of this amendment the Legislature of this state, at its Fifteenth session, enacted House Bill No. 414 and Senate Bill No. 288, which were approved by the Governor and are now laws of this state, creating a state system of rural credits under the control and management of a South Dakota rural credit board to consist of the Governor and four members to be appointed by him. Said laws in terms provide for the establishment not later than July 1, 1917, and the maintenance thereafter at the seat of state government, of a system of rural credits, and empower the said board, among other things, to receive applications for farm loans, to appraise the property on which such loans are sought to be placed, to examine the titles, ascertain the loan value of said real estate, and, these things being accomplished, to approve the loans and thereupon borrow money on warrants or bonds issued by said board, payable by the state,

on the good faith and credit of the state, to be used in completing the loans to the persons from whom such applications are received.

The details as to the organization of the board and its method of transacting business, as well as the face or par value of the bonds or warrants to be issued by the board, are fully comprehended with the provisions of these laws. It was clearly the intention of the electors of this state in ratifying the said constitutional amendment to pave the way and lay the foundation for the creation by the state Legislature of a state system of rural credits, and the Legislature, fully intending to effectuate the intent of the voters and to bring into being the necessary provisions and machinery to establish and maintain a state system of rural credits, placed on the statute books of this state House Bill No. 414 and Senate Bill No. 288 aforesaid.

Both state laws were passed with emergency clauses and are now in full force and effect as laws of this state, and the undersigned, as Governor of this state and its chief executive, was about to exercise the authority conferred upon him by the acts and to appoint the four members of the South Dakota rural credit board under the provisions of said laws, when the constitutionality of said laws was called in question. The contention is that, under the provisions of section 2 of the same article of the state Constitution, which reads as follows:

"For the purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate $100,000, and no greater indebtedness shall be incurred except for the purpose of repelling invasion, suppressing insurrection, or defending the state or the United States in war and provision shall be made by law for the payment of the interest annually, and the principal when due, by tax levied for the purpose or from other sources of revenue."

—the said laws and provisions thereof as to the issuance of bonds and warrants on the good faith and credit of the state, and the appropriation made for the purpose of carrying said act into effect, are unconstitutional and void.

While it is true that there was no express provision in the amendment to section 1 of article 13 for the repeal of section 2 or any part thereof, of the same article, it was the intent and

belief of the electors and of the Legislature that the limitation in said section 2 did not apply to the obligations to be issued under section 1 as amended for the purpose of completing loans for which applications had been made to the said rural credits board. The primary idea of the amendment and of the laws was to obtain funds upon the good faith and credit of the state by the issuance of bonds or warrants at low rates of interest to complete loans for which applications had been made and approved. In other words, the state was to merely act for the benefit and behoof of and obtain for its citizens, in order to promote the agricultural development of the state, money at the very lowest rate of interest possible, and if it shall come to pass that the state is unable to make these loans on its good faith and credit, the entire plan must fail. It is necessary also, in order to obtain loans for long periods of time and at low rates of interest, that there shall be no uncertainty in the mind of the lender as to the legality of the bonds or warrants.

There is therefore presented before me, in the exercise of my powers as Governor and chief executive of this state, very grave and important questions of law, and before making the appointment of the additional four members of said board and completing the organization of said South Dakota rural credit board, and to the end that any and all questions as to the legality of said statute and the appointment of the members of said board and the validity of the bonds or warrants and the appropriations made to carry into effect the provisions of the act may be settled and adjudicated by the decision of this court, and in order that I may be advised as to my duties upon these grave and important questions of law involved in the exercise of my executive powers, may it please your honors to prepare and submit to me your opinion upon the following questions:

(1) May the state, through a South Dakota rural credit board, receive applications for farm loans, examine the title, appraise and fix the loan value of the land on which said loans are sought to be placed, and, these things being accomplished, borrow money on bonds or warrants on the good faith and credit of the state to be used in completing the loans for which applications have been made to said board?

(2) Are the provisions of section 1 of article 13 of the state Constitution and House Bill No. 414 and Senate Bill No. 288 in conflict with the provisions of section 2 of said article 13 of the state Constitution?

(3) If the first question herein propounded is answered in the affirmative, are there any limitations on the amount of money that may be borrowed by the South Dakota rural credit board on the good faith and credit of the state on bonds or warrants payable by the state, to complete loans for which applications have been received by the said board.

Respectfully submitted,

PETER NORBECK,

Governor of South Dakota.

To His Excellency Peter Norbeck, Governor:

We have the honor of acknowledging the receipt of your communication referring to two acts, "H. B. 414" and "S. B. 288" which have but recently been enacted, being chapters 333 and 334, respectively, of the Laws of 1917, and propounding to us the following questions pertaining to such acts:

"(1) May the state, through a South Dakota rural credit board, receive applications for farm loans, examine the titles, appraise and fix the loan value of the land on which said loans are sought to be placed, and, these things being accomplished, borrow money on bonds or warrants on the good faith and credit of the state to be used in completing the loans for which applications have been made to said board?

"(2) Are the provisions of section 1 of article 13 of the state Constitution and House Bill No. 414 and Senate Bill No. 288 in conflict with the provisions of section 2 of said article 13 of the state Constitution?

"(3) If the first question herein propounded is answered in the affirmative, are there an limitations on the amount of money that may be borrowed by the South Dakota rural credit board on the good faith and credit of the state on bonds or warrants payable by the state, to complete loans for which applications have been received by the said board?'

[1] Your letter calls to our attention the fact that, under said acts, it is your duty to appoint the members of the rural credit board therein provided for. It is clear that the advisability of

appointing such board and of incurring expenses incident to its organization and compensation depends upon the proper answer that may be made to the questions you have propounded. We are therefore of the opinion that the questions propounded are "important questions of law involved in the exercise of (your) his executive powers," and therefore that there is presented an occasion authorizing you to call upon us for our opinions upon such questions.

[2] The importance of the Constitution in our form of government cannot be overestimated. Through it the people enter into a solemn compact, each with each and all of the others, that ours shall not be a mere government of men, but that it shall be a government of laws, which laws shall conform to the terms of such compact. Therefore, while there is vested and must always remain in a sovereign people, unless they have surrendered some part of their sovereignty, absolute plenary power, yet, when such a sovereign people see fit to enter into a compact with one another that the laws governing their political, social, and industrial relations shall conform to certain fundamental rules and principles, it is for their courts to see that such compact is lived up to by the representatives of the people.

[3, 4] In adopting the original Constitution of this state the people entered into a compact whereby, among other things, they agreed that the state should not "loan or give its credit or make donations to or in aid of any individual, association, or corporation, except for the necessary support of the poor * * *" (article 13, § 1); that, except for certain named purposes, not including the purpose of the acts before us, the state might never contract debts to exceed with previous debts an aggregate of $100,000 (article 13, § 2); that the Legislature should provide an annual tax to defray the ordinary expenses of the state each year, and "for the purpose of paying the public debt, the Legislature shall provide for levying a tax annually, sufficient to pay the annual interest and the principal of such debt within ten years from the final passage of the law creating the debt" (article 11, § 1). It will thus be seen that the people of this state entered into a compact whereby they agreed not to give financial aid to indivi-

duals, not to go into debt in excess of $100,000, to meet ordinary expenses as they arose, and to provide for payment of debts within ten years from their creation.

Formerly in this country it was the accepted theory that, while the government should secure to every one equal rights under the law, yet it was not a proper governmental function to render financial assistance to the individual members of society except to the poor; hence the adoption of constitutional provisions such as section 1, art. 13, supra. But of late years there has developed a growing belief, founded undoubtedly upon the proposition that the welfare of society as a whole depends upon the welfare of the individual members of society, that a government is not fulfilling all of its proper functions unless it gives to its people, not only collectively, but individually, every manner of assistance within its power which may be deemed consistent with the general welfare. Whether this new theory of government is sound, history only can determine; the right of the people to adopt same no one can dispute. Section 1, art. 13, supra, stood as an effectual barrier to the adoption of any legislation in line with such new theory. Realizing this fact and knowing that the development of the potential resources of this state depends to a great extent upon the cheapness of the money needed therefor, and further believing that such money could be furnished to the people at a lower rate of interest if procured through the medium and backed by the credit of the state, the people, in the exercise of the plenary power in them vested, amended their compact so as to allow the state to "establish and maintain a system of rural credits and thereby loan money and extend credit to the people of this state upon real estate security in such manner and upon such terms and conditions as may be prescribed by general law." Amendment to section 1, art. 13, adopted in 1916. Do the other sections of the Constitution to which we have called attention still prevent the establishment of such a system of rural credits as is provided for by the two acts to which you have called our attention? Our associates have reached the conclusion that they do not, and base this conclusion upon the proposition that, in giving to the Legislature power to establish such system of rural credits the people have taken this matter entirely out from under the other limitatons provided by our fundamental law. We are un-

able to agree with this conclusion. At the same election at which the above amendment was adopted there was a further amendment adopted which was in effect an amendment to a provision of section 1, art. 13, supra, reading, "Nor shall the state engage in any work of internal improvement." By such amendment the state is authorized to construct and maintain good roads and also to supply coal to the people from coal lands belonging to the state. We believe that in the building of roads and the supplying of coal the power of the Legislature is restricted by the other provisions of the Constitution; in short, we do not believe that the Legislature has been given the power to issue bonds or warrants to any amount it may see fit, such bonds or warrants to be payable out of funds raised by general taxation, and not through some special fund otherwise provided, and thus involve this state in unlimited indebtedness to carry out the purposes of such amendment. We believe that these other sections apply to legislation enacted under these amendments just as they would have applied if such amendments had been a part of the Constitution when such Constitution was first adopted. While we are of the opinion that these acts could not stand if in conflict with these other provisions of the Constitution, yet we are of the opinion that, under a proper interpretation of certain words used in these provisions, the acts in question are valid and contemplate nothing conflicting with the provisions of our Constitution.

We will consider these acts separately, first "H. B. 414," and then "S. B. 288," which merely amends one section of the other act. It is necessary for us to call attention to but a few of the provisions of "H. B. 414." It provides for the appointment of a rural credit board. It provides an appropriation ample to organize such board, and to pay the salaries and expenses thereof until the receipt of revenues otherwise provided for. But the provisions especially important to our present consideration are those authorizing the board to "borrow money on the good faith and credit of the state of South Dakota, to be used in lending money on real estate," authorizing the issuance of bonds or warrants in the name of the state on which to borrow the money necessary to make loans, declaring that the rate charged on loans made shall be "not less than three-fourths of 1 per cent., nor more than one and one-half per cent." more than the rate paid on money bor-

rowed by such board, declaring that the notes and mortgages taken by the board, or lands or other property acquired by it, "shall be held in trust for the payment of moneys borrowed * * * and never shall be diverted to any other purpose * * *" Such act contains no provision whatsoever for the levying of any tax to meet the payment of either the principal or interest on such bonds or warrants as the board might issue. It is apparent that the act contemplated the borrowing of moneys greatly in excess of $100,-000 as there is scarcely an agricultural township in this state which would not, under the provisions of this act, support loans far in excess of such amount. If this act is valid and accomplishes its object, it will undoubtedly result in the issuance by the board of bonds and warrants running into the millions of dollars, and yet there has been no repeal of the constitutional limitation on indebtedness nor any repeal of that provision of the Constitution which requires the Legislature to provide for the levying of a tax sufficient to pay the annual interest and principal of debts within ten years.

[5] We are thus presented with the question of whether a bond or warrant issued under "H. B. 414" would create a "debt" under the various provisions of the Constitution which we have mentioned above. At first blush it might seem as though there were no room for interpretation; that the meaning of the word "debt" was too well established to admit of doubt in relation thereto. Webster's New International Dictionary defines "debt" as:

"That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit; thing owed, obligation, liability."

But it needs no argument to show that, if we give to the word "debt," as such word is used in our Constitution, the broad meaning that it has in common parlance, neither the state nor any political division thereof could perform any of the functions pertaining thereto, and therefore, as was said in Valparaiso v. Gardner, 97 Ind. 1, 49 Am. Rep. 416:

"While it is our duty to yield to the words of the Constitution, still, in determining what meaning they were intended to

have, it is proper to consider the * * * object it was intended to accomplish. Cooley, Const. Lim. (5th Ed.) 78, 79."

It has therefore been quite uniformly held that the word "debt," as used in such constitutional provisions, does not include any pecuniary obligation imposed by contract which, within the lawful and reasonable contemplation of the parties thereto, is to be satisfied out of the current revenues for the year, or out of some fund then within the immediate control of the corporation. In re State Warrants, 6 S. D. 518, 62 N. W. 101, 55 Am. St. Rep. 852; Appeal of the City of Erie, 91 Pa. 398; McNeal v. City of Waco, 89 Tex. 83, 33 S. W. 322; Swanson v. Ottumwa, 118 Iowa, 161, 91 N. W. 1048, 59 L. R. A. 620. What was the object intended to be accomplished by those laws which provide for the levying of taxes to speedily pay a "debt" when contracted and provide for the limitation of the total indebtedness of a state or of a political division thereof? These provisions were adopted in order to counteract the tendency of the living to obtain conveniences at the expense of unborn generations; in other words, to prevent the casting upon the shoulders of tomorrow the burdens that should be borne by today. But only those laws should be held to be under the ban which have the purpose and effect of accomplishing that which these provisions are intended to prevent. No law can properly come under such ban which does not intend the actual incurring of a liability and the future levying of taxes to meet the same. If the law contemplates that the liability shall be met and cared for in a manner other than by general taxation, the mere possibility that the contingency may arise under which such liability or a part thereof shall need to be met through a general tax, at least unless it is apparent that such possibility is in fact a probability, is not enough to invalidate the law. Thus in the case of Streib v. Cox, 111 Ind. 299, 12 N. E. 481, where an act allowed bonds to be issued by a county to build roads and provided that such bonds should be paid from assessments levied against lands benefited by such roads, there being no provision for the payment of such bonds from general taxes, the court held that such law did not provide for the contracting of a "debt" by the county, and said:

"We are of opinion that the bonds issued by the board of commissioners of Grant county, under the provisions of the section

quoted and pursuant to the authority thereby conferred, did not and do not constitute an indebtedness of such county, and did not and do not evidence an indebtedness incurred by such county, within the inhibition of article 13 of our state Constitution. Such bonds are not payable by the county, or out of the general funds of the county treasury. They are payable out of the particular fund to be raised by the collection of the assessments made on the lands adjacent to such free gravel road, 'divided in such manner as to meet the payment of principal and interest of said bonds,' and placed as divided upon the tax duplicates against the lands assessed, 'and collected in the same manner as other taxes,' which fund, when so collected, 'shall be applied to no other purpose than the payment of said bonds and interest.' No other provision is made by law for the payment of either the bonds or the interest thereon; and the bonds and interest are made payable out of the particular fund to be derived from the collection of the assessments made on the lands adjacent to such free gravel road, and from no other source, and such fund is pledged by the statute for the payment of said bonds and interest. It is manifest, we think, from all the provisions of the above-entitled act of March 3, 1877, and the amendments thereof, that the Legislature intended that the entire cost and expense of constructing any free gravel, macadamized, or paved road, and all bonds of the county issued for the purpose of raising the money necessary to meet the expense of such improvement, should be borne and paid out of the particular fund to be raised by and from the collection of the assessments made on the lands adjacent to such road. While it is provided that the preliminary expenses of such an improvement may be paid out of the county treasury, yet it is further provided that the amount so paid must be refunded out of the particular fund to be raised as aforesaid from the assessments on adjacent lands."

In State ex rel. v. Mayor, etc., 203 Mo. 40, 101 S. W. 99, the court, in holding that the ordinance under consideration did not contemplate the contracting of a "debt" under the Constitution of that state, said:

"The contract in question provides for the creation of a special and particular fund without resorting to the power of public taxation; and the waterworks company, and Smith, its assignee,

may look alone to that fund in the first instance. What might
happen if the city tortiously misappropriated and dissipated that
fund we need not inquire. Such acts might (or might not) render
the city liable as for a tort; and the liability for torts is not one
within the constitutional provision under consideration."

In Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462,
14 L. R. A. (N. S.) 874, the court, citing former opinions of the
same court, said:

"A city may acquire a system of waterworks by pledging the
income until it shall pay for the system, and no indebtedness is
created. The same rule might apply to some definite extension of
waterworks where the income of the extension could be separated
and applied to payment."

In Quill v. City of Indianapolis, 124 Ind. 292, 23 N. E. 788,
7 L. R. A. 681, a case construing a statute whose provisions are
quite analogous to those of "H. B. 414," the court said:·

"It becomes necessary to determine whether bonds or certi-
ficates issued in pursuance of the provisions of the act * * *
create an indebtedness within the inhibition of section 13. It is
essential, therefore, that we consider the act and ascertain its
scope, purpose, and effect. An examination of the statute dis-
closes at once that the entire cost and expense of constructing
any work or improvement provided for therein for the payment
of which bonds or certificates may be issued is to fall primarily
and exclusively upon the property benefitted, except only for such
part of the work as shall be occupied by street and alley cross-
ings, the expense of which the corporation is to pay. Provision
is made whereby, during the progress of the work, estimates may
be made from time to time of the amount of work done by the
contractor, and the amount of the estimates, less a reasonable
percentage to secure the completion of the contract, may be paid
out of the corporate treasury; but the amount of such estimates is
made a lien upon the several parcels of ground upon which they
are assessed in favor of the municipality and the owner of the
certificates or bonds which may afterwards be issued. Elliott's
Supp. § 816. Of course the money thus advanced by the city
does not constitute a debt against the city. It is simply money
advanced by the city to be repaid by the property owners."

To the same effect are the decisions of many other states.
Many of these decisions will be found cited in Swanson v. Ottum-

wa, supra. We have no hesitancy in holding that "H. B. 414" did not provide for the creation of any liability constituting a "debt" under our Constitution.

But it was undoubtedly because "H. B. 414" did not provide that the state should in any manner be responsible for and liable to pay bonds or warrants issued under such act that the Legislature thought it necessary to enact "S. B. 288." The Legislature undoubtedly believed, and we think correctly, that if the purchasers of bonds and warrants were compelled to look, for the payment of such bonds and warrants, solely to the fund created by moneys paid upon the loans made upon farm lands, such bonds and warrants could not be negotiated at so low a rate of interest as if the credit of the state was pledged to their payment. The one central purpose of establishing a rural credit system was not to bring more, but cheaper, money into the state. To accomplish this, "H. B. 414" was amended by "S. B. 288," the material amendments being as follows:

"If at any time there shall not be sufficient funds in the treasury of the South Dakota rural credit board to pay the said bonds or warrants or interest thereon at maturity thereof, or when same shall become due, it shall be the duty of the tax commission of this state, upon request of said board, to make a special assessment and levy immediately to pay same when due, which levy shall be collected in the same manner as other tax levies made by said commission. Whenever such tax levy shall have been made it shall be the duty of the state auditor upon the request of said board to issue his warrant or warrants as said board may direct, bearing interest not to exceed five per centum per annum, and register same, drawn on the fund to be derived from such special levy, in an amount, with interest provided in said warrants, not exceeding said levy, and deliver same to said board, and such warrants may be sold by said board. All moneys derived from said special levy or from the sale of such special warrants shall be placed in a special fund to be designated 'rural credits fund' and shall be used only for the payment of said warrants drawn on said fund, and the payment of said bonds, warrants and interest when same become due. All of said moneys derived from said special levy are hereby appropriated for the payment of the warrants drawn on said fund and the payment of said bonds,

warrants and interest at maturity; and it is further provided that in all matters relating to said original act and amendments thereto the state of South Dakota may sue and be sued as a private individual."

Such amendment does nothing more than to designate a contingency under which a debt against the state will arise. Unless such contingency happens there can no more be a "debt" as such word is used in the Constitution than there could be such a "debt" under "H. B. 414." Not only does the existence of a "debt" rest upon a contingency, but when one considers the provisions of these two acts—the class and amount of security required for loans made by the board, the opportunity given the board to arrange so that the maturity of loans will meet or antedate the maturity of bonds and warrants, the margin between interest paid by and that received by the board—such contingency is reduced to but a remote possibility. Such a contingent debt is not a "debt" under the provisions of our Constitution. People v. Arguello, 37 Cal. 525; Doland v. Clark, 143 Cal. 176, 76 Pac. 958.

We therefore answer your questions as follows:

Question No. 1:   Yes.

Question No. 2:   No.

Question No. 3:   No.

Respectfully submitted,

CHAS. S. WHITING,

JOHN HOWARD GATES,

SAMUEL C. POLLEY,

Judges.

To His Excellency, Peter Norbeck, Governor:

Ordinarily the provisions of a state Constitution are limitations upon   the plenary power of the state lawmaking body. Under the broad and comprehensive effect of section 1, art. 13, of our state Constitution, as it existed prior to 1916, a rural credits law could not have been legally enacted by our state Legislature in the exercise of its plenary power. To expressly give power to the Legislature to enact such a law an amendment to said section 1, art. 13, was adopted at the 1916 general election. This amendment is a granting of express legislative power and not a limitation of power. Under the well-established rules governing the construction of Constitutions, established by the courts

of this country, where a power is expressly granted to a legislative body, everything necessary to effect and carry out the object and purposes of the express power thus granted is also by implication necessarily granted to the Legislature and the executive officers who are intrusted with the duty of administering such power. It therefore of necessity follows that every other provision of the state Constitution in conflict with the express power thus granted, and its substantial fulfillment, are to that extent modified and qualified and made subservient to the purposes of the express power so granted.

On this ground alone I concur in the answers made to the questions propounded as appear in the foregoing communication of Justices WHITING, GATES, and POLLEY.

Very respectfully submitted,

J. H. McCOY.

In my judgment, the only question involved in answering the annexed communication of his excellency the Governor is the effect of section 2, art. 13, of the Constitution, which prohibits the state from contracting an aggregate indebtedness in excess of $100,000.

Clearly the people, when they authorized the Legislature to establish a system of rural credits, did not contemplate the loaning of current state revenues, nor the creation of a fund by future general taxation, to be used in making such loans. But the people did intend to authorize the Legislature to create, establish, and maintain a system of rural credits in such manner as would enable the state to obtain funds necessary to extend credit and loan money to the people of the state.

It seems to me wholly unnecessary to indulge in nice distinctions and analogies which demonstrate that an indebtedness is not a debt, simply because the debtor has or proposes to take what amounts merely to security equal to the amount of money it borrows, and thus has a fund from which to liquidate or secure its indebtedness.

The rule sought to be invoked by three of my Associates was evolved by the courts simply for public convenience, and only permits the expenditure of revenues anticipated and provided for by some form of tax levy already made.

Under the extension of this rule indicated, the state might issue bonds in unlimited amounts, provided only the legislation under which such bonds were issued authorized the investment of funds derived therefrom in some form of property declared to constitute a fund out of which such bonds should be paid; in short, so long as the state retained possession of the money borrowed, or the property in which it was invested, the obligation of the state to pay the bonds would not be a debt, and the Legislature might have passed the Rural Credits Act without any violation of section 2, art. 13.

Section 2, art. 13, in my judgment, prohibits only the incurring of indebtedness which is intended to, and must, be paid out of funds derived from the usual and ordinary current state revenues, and in no manner limits the power conferred upon the Legislature by the amendment of 1916 to provide funds necessary to create and establish a system of rural credits. The people might have placed limitations upon the powers conferred by the amendment, but they did not see fit to declare any such limitations, and the courts should not assume to do so. Possibly we may assume that the people believed real estate securities would insure the state against losses upon loans when made under such wise and safe regulations as the Legislature might prescribe, and that the ordinary revenues of the state would never be called upon to make good any such losses, and limitations were therefore unnecessary.

To my mind, it is clear that by necessary implication the amendment to the Constitution empowering the Legislature to create a rural credits system for the loaning of money and extending credit to the people of this state granted to the Legislature full power and authority to enact such legislation as in their wisdom they might deem proper to provide funds necessary to render it effective, including the authority to create an indebtedness of the state adequate to effect the purpose of the amendment.

I therefore concur in the answers given by my Associates to the questions submitted by his excellency the Governor.

ELLISON G. SMITH.