McFARLAND, Plaintiff v. BARRON et al., Defendants

(164 N.W.2d 607)

(File No. 10602. Opinion filed February 4, 1969)

640

**Acie W. Matthews,** Sioux Falls, for plaintiff.

**Danforth, Danforth & Johnson,** Sioux Falls, for defendants.

ROBERTS, Judge.

The South Dakota Building Authority acting under the provisions of Ch. 276, Laws 1967, by resolution indicated its intention to issue bonds in a sum not to exceed $1,325,000 to provide funds for the construction and equipping of a classroom and auditorium building at Northern State College and a central kitchen and dining facility at the State Training School.

Plaintiff as a citizen and taxpayer seeks in this court a writ of prohibition enjoining the issuance of the proposed bonds asserting that the bonds would constitute a debt or obligation of the State in excess of the amount of indebtedness authorized under the provisions of § 2, Art. XIII, of the Constitution of this State. Defendants, who are members of the Building Authority, moved to dismiss the application for the writ and the proceedings herein on the ground that the statute is valid and not subject to the constitutional objections asserted.

The Building Authority, which consists of seven members appointed by the Governor with consent of the Senate, is declared to be a "body corporate and politic". It is empowered to build or otherwise acquire (including the power of condemnation) any building or facility for the use of the State as the legislature by law declares to be in the public interest and to investigate and report and recommend to the legislature the building needs of the State and to obtain estimates of costs.

The legislature by the enactment of Chapters 217 and 218, Laws 1968, concurred in the report and recommendations of the Building Authority and authorized the construction, furnishing and equipping of the aforementioned buildings and the issuance of bonds, but expressly declared that no obligation incurred "shall be or become a lien, charge or liability against

the State of South Dakota, nor against the property or funds of the State of South Dakota within the meaning of the Constitution or Statutes of South Dakota." The statute creating the Building Authority with reference to the issuance of bonds provides that they shall be payable only from (1) revenues to be derived from the operation of any facility acquired or constructed with proceeds of the bonds, (2) income to be derived from rental leases to state departments, boards or commissions or from leases to others and, (3) funds in the Educational Facilities Fund not otherwise appropriated or pledged. It is further provided that each bond shall state upon its face that it is payable solely from revenues derived from operation of the facility or from income to be derived from rental leases and that it does not constitute an obligation of the State within the meaning of its Constitution or statutes.

Section 2, Art. XIII, of the Constitution of this State provides that for the purpose of making public improvements, or to meet extraordinary expenses, or deficits or failure in revenue, the State may contract debts never to exceed with previous debts $100,000, and no greater indebtedness shall be incurred except for purposes which are not here relevant. In State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907, this court held that the issuance of bonds for the construction of two dormitories at a state college, payable out of net revenues of the buildings, did not create an indebtedness within the meaning of the constitutional debt limitation. This special fund doctrine was subsequently considered by this court in relation to the issuance of bonds by municipalities and was followed and applied. Mettet v. City of Yankton, 71 S.D. 435, 25 N.W.2d 460; Clem v. City of Yankton, 83 S.D. 386, 160 N.W.2d 125.

Plaintiff places much reliance on Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1. In that case, the Board of Regents by resolution had indicated that it intended to exercise the authority vested in it by Ch. 49, Laws 1955, to construct three buildings at an educational institution under its control and to finance their construction by pledging the net revenue of the new buildings and in addition thereto the net revenues, in an amount of not

less than $500,000, of the dormitories then in use at the college. Plaintiff sought a writ of prohibition to enjoin the board from taking action pursuant to the resolution. This court held that the transfer of net revenues of the existing dormitories to payment of the principal and interest of the bonds and the need of replacement with tax monies created a debt within the contemplation of § 2, Art. XIII of the Constitution. This test is not applicable in the present proceeding. There are statutory differences. Under the proposed contract in the instant proceeding it is expressly provided that the obligation of the State to pay rentals will be optional and for that reason no enforceable obligation results.

The principal question to be determined is whether the rental plan in the Building Authority Act in anywise violates the debt limitation provisions of the Constitution. The Building Authority is vested with power to lease buildings or facilities to participating agencies of the State. The leases must contain a provision that rents shall be payable solely from appropriations to be made by the legislature and any revenues derived from the operation of the leased premises. In the event of nonpayment of rents by the State, the building or facility may be leased to others for suitable purposes. A lease may be made for a term of one year from the time a building is completed and ready for occupancy, with an option to the lessee to extend the term for one year from the expiration of the original term and for one year from the expiration of each extended term until the original term of the lease has been extended for a total number of years to be agreed upon at a rental which, if paid for the original term and for each of the full number of years for which the term of the lease may be extended, will amortize the total cost of the erection of the building and appurtenances.

The proposed contract between the Building Authority and bondholders will necessarily embody the limitations and restrictions contained in the Building Authority Act and the 1968 statutes above cited. The source of payment of the bonds will be rents payable from appropriations made or to be made by the legislature. The proposed leases to be entered into be-

tween the Building Authority and the participating agencies of the State will provide for the payment of annual rentals from available appropriations and will be automatically renewed if an appropriation for such purpose is made. They would not have the effect of creating an immediate debt or liability in the aggregate amounts of the future rents. The general rule is that there is no obligation to pay until rent is due under the terms of a lease. I Tiffany, Landlord & Tenant, § 166; Gardiner v. William Butler & Co., 245 U.S. 603, 38 S.Ct. 214, 62 L.Ed. 505; Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N.W. 635, 112 A.L.R. 269. This common law concept has been followed in cases dealing with debt limitation provisions. City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341; State ex rel. LaFollette v. Reuter, 33 Wis.2d 384, 147 N.W.2d 304; Protsman v. Jefferson-Craig Consol. School Corp., 231 Ind. 527, 109 N.E.2d 889; Clayton v. Kervick, 52 N.J. 138, 244 A.2d 281; McArthur v. Smallwood, 225 Ark. 328, 281 S.W.2d 428; Walinske v. Detroit-Wayne Joint Bldg. Authority, 325 Mich. 562, 39 N.W.2d 73.

■ ■ The statute under consideration meticulously provides that leases may be made subject to available appropriations and any revenues derived from the operation of leased property. An appropriation of money which is to be satisfied out of current revenues for the year does not create an indebtedness. This court in referring to an appropriation to pay current obligations in anticipation of uncollected revenues in an early opinion observed: "Critically considered, it may constitute the incurring of an indebtedness; but it is not an indebtedness repugnant to the constitution, because its payment is legally provided for by funds constructively in the treasury." In re State Warrants, 6 S.D. 518, 62 N.W. 101, 55 Am.St.Rep. 852; see also In re Rural Credits Law, 38 S.D. 635, 162 N.W. 536. Some suggestion is made that the State would have a moral obligation to discharge the bonded obligation. While the legislature in making appropriations may not be confined to legal obligations, but may recognize moral or equitable obligations (Payne v. Jones, 47 S.D. 488, 199 N.W. 472), there would exist under the proposed leases no binding legal obligation to authorize ex-

penditures for rent. The availability of appropriations, in other words, is within the exclusive' control of the legislature. In the event of nonpayment of rent or failure of the legislature to appropriate funds the Building Authority is empowered to lease the building or facility to others for suitable purposes to meet accruing payments.

In Berger v. Howlett, 25 Ill.2d 128, 182 N.E.2d 673, the action was for injunctive relief and for declaratory decree that the Building Authority Act of that state, after which the statute in this State is patterned, was unconstitutional and void. The court determining the act to be constitutional observed: "*  *  * that the fact that the General Assembly will appropriate money during its regular sessions to pay rent does not create a debt; and that the statutory provisions authorizing a pledge of the income and property of Authority, the sole sources to which the bondholders may look, does not create a debt against the State, *  *  *  The charges, fees or rentals to be established by the Authority are limited to amounts sufficient at all times to pay the principal of and interest on the bonds and cost of maintenance. Here the act provides that leases to the State or its agencies shall provide that the rents shall be payable from appropriations made by the General Assembly at each session for such purpose, and, in case such rental is unpaid, it is entirely clear that no claim is preserved against the State inasmuch as the Authority is given the power to lease the building or facility to others for any suitable purposes."

It is argued that the lease plan is a subterfuge and device to circumvent the Constitution. The authorities are reviewed in 71 A.L.R. 1326 and the conclusion stated:

"If it be urged that a bona fide lease with option to purchase is a palpable scheme or device to evade the constitutional limitation of indebtedness, it must be answered that, while this arrangement is designed to avoid the effect of such a constitutional provision, it is intended to do so lawfully, by keeping out of prohibited territory altogether, rather than by attempting to cross this ter-

ritory in disguise; that this plan is not designed to accomplish indirectly that which could not be done directly, but rather to accomplish legally that which could not be done in an unlawful manner. For it must be kept in mind that the purpose of a debt limitation is not to prevent the municipality from acquiring buildings or public works, but to place a limitation on the extent to which it may pledge its credit and hence burden the taxpayers. And if it can acquire such property without becoming indebted therefor or exceeding the constitutional limitation, neither the spirit nor the letter of the provision has been violated. There is, in the typical case, an intention to acquire the leased property, but no obligation to do so."

In a supplemental annotation, 145 A.L.R. 1362, it is said:

"The recent cases on the point tend to confirm the general principle stated in the original annotation, that the leasing of property by a city, county, or other political subdivision, with an option to purchase the same, does not give rise to an indebtedness or liability of the public body for the stipulated optional purchase price or for the aggregate of all the rentals for the entire term, provided the instrument is in fact a lease, and not a contract of purchase on the instalment plan."

We recognize that courts throughout the country are not in harmony as to the validity of financing plans basically similar to that now before us. We think that the weight of authority and prior decisions of this court sustain validity. We must be mindful that the wisdom and expediency of a statute is for the legislature and not for this court. It is elementary that if a statute appears on its face to be constitutional and valid, we may not inquire into the motives of the legislature and that all doubts must be resolved in favor of its validity. We concur in the observation that "[i]t is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it." Tranter v. Allegheny County Authority, 316 Pa. 65, 173 A. 289.

Since the stipulation of the State to pay rents to the Building Authority will be subject to available appropriations and current revenues, the inhibition of the debt limitation provisions of the Constitution will not apply.

■ The motion to dismiss is therefore granted. A public question being involved, no costs will be taxed.

HANSON and HOMEYER, JJ., concur.

RENTTO, J., and BIEGELMEIER, P. J., dissent.

RENTTO, Judge (dissenting).

The debt limitation provision here in question was last discussed by us in Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1. That case states some basic principles concerning this provision of our Constitution which must be kept in mind in approaching the matter in issue. As therein indicated our Constitution reveals a pay as you go policy in the fiscal affairs of our state. The purpose of such policy is to counteract the tendency of the living to obtain conveniences at the expense of unborn generations. It is designed to prevent the casting upon the shoulders of tomorrow the burdens that should be borne by today. In construing and applying such provision it is our duty to effectuate its purpose.

To accomplish this objective the word "debt" as used in that provision must be viewed in the sense in which it is commonly understood rather than as a technical or legalistic term. Our concept of it should not be doctrinaire. "Obligations which are to be paid from revenue subject to appropriation by future Legislatures are subject to the state debt limitation provision." State v. Steen, Neb., 160 N.W.2d 164. What constitutes a debt within this provision is a judicial and not a legislative question. State Office Building Commission v. Trujillo, 46 N.M. 29, 120 P.2d 434. In Boe we said "that nothing short of a limitation applicable to debts of every kind can afford a taxpayer adequate protection." I think it must be held to include the obligations assumed on behalf of the state in relation to these buildings.

The rule applied by the majority that future rents are not a debt is of doubtful validity. Concerning it in an article entitled "Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions" in Vol. 68, Yale Law Journal, p. 234, the author comments:

> "The Wisconsin view—that future rents are not debts as a matter of common law—derives from ancient precedents: the rule is pronounced as a mystery of the common law inherited unchanged from Coke's Littleton. However venerable its origins, the rule appears questionable, for future rent has all the attributes of an immature debt that will become actionable when due. In fact, the rule was possibly poor law even in Lord Coke's day. At any rate, it certainly seems contrary to modern understanding."

To apply it in this case clearly ignores what this court said in Boe.

Quoting from Cooley on Constitutional Limitations, 7th Ed., in construing the provision in question we said in that case "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." The extent to which we should go in protecting the taxpayer in our application of the debt limitation provision is made clear by this language from that opinion: "What reason can be advanced for concluding that the practical men of common sense who framed and adopted this compact intended less than the most effective protection they could provide for the taxpayer." Because I think the view of the majority is not in keeping with these salutary basic principles I feel compelled to dissent.

The majority opinion is premised on the proposition that the arrangements entered into between the Authority and the Board of Regents concerning the building on the campus at Northern, and between it and the Board of Charities and Cor-

rections as to the building at the Training School are leases. This I am unable to accept. Practically speaking the state through these agencies, with the sanction of the legislature, is buying these buildings. The arrangements are not in fact leases, but rather contracts of purchase.

The Supreme Court of Maine in Opinion of the Justices, 146 Me. 183, 186, 79 A.2d 753, expresses the same view in these terms. "The so-called lease is not in legal effect a lease, it is a contract of purchase. The so-called rental is not true rent, to wit, payment for the use of property. The total amount of so-called rental is the purchase price the State is to pay for the property." Rent is compensation for the use of property, not the consideration for its purchase.

In this case it is to be noted that the annual payments which the agencies must commit the state to make are not related to any marke value of the property, but are in the precise amount "to provide the income necessary for the payment of said revenue bonds, and for payment of interest thereon and the establishment of necessary reserves therefor and for legal, financing, administrative and other costs incidental thereto". The act provides that when these payments are sufficient to pay the cost of each project or facility, including maintenance and operation expenses and that proportion of the administrative expense of the Authority as provided for by the lease the property shall be conveyed without charge to the lessee. This obviously is limited to the state because the Authority isn't authorized to convey property to anyone else.

Moreover, the act makes it the duty of the Authority to enter into these arrangements with the state. It has no choice. While there is provision for leasing to others in case of default by the state this is window dressing. Under the law the plans and specifications for these buildings are prepared by the agency involved. Because of the special design of these structures and their location, it is unrealistic to believe that anyone else would lease them, or that the state would permit such to happen.

After all, these agencies have a continuing responsibility to provide the functions for which these buildings are being acquired. Is it reasonable to believe that the state will not continue these payments? If it does not, the Authority is out of business because the only certain source of income available to it for repayment of its borrowings and interest thereon are the payments made to it by the state for the occupation and acquisition of the facilities provided by it.

A careful reading of the act convinces me that it is a studied effort to circumvent the Constitution. State ex rel. Washington State Finance Committee v. Martin, 62 Wash.2d 645, 384 P.2d 833. That same court in State of Washington ex rel. Washington State Building Financing Authority v. Yelle, 47 Wash.2d 705, 289 P.2d 355, said of a somewhat similar act "When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation". See also McCutcheon v. State Building Authority, 13 N.J. 46, 97 A.2d 663; Ayer v. Commissioner of Administration, 340 Mass. 586, 165 N.E.2d 885; City of Phoenix v. Phoenix Civic Auditorium and Convention Center Association, 99 Ariz. 270, 408 P.2d 818. To hold otherwise would be to "exalt artifice over reality". Ayer v. Commissioner of Administration, supra. It is fundamental that the legislature may not accomplish indirectly what it is not permitted to do directly. In determining whether this is being done we must look through form to the substance of a transaction.

In an article entitled "Lease-Financing by Municipal Corporations as a Way Around Debt Limitations", Vol. 25, Geo.Wash. Law Rev., p. 377, the author writes: "Lease-financing is not really renting, but is borrowing. The objections lie in the consequences of this fiction. Intent of constitutional debt limitations is subverted and litigation is invited, bringing in its wake costs and uncertainties, and loss of credit standing. * * * A far better solution to these difficulties lies not in sophistic and strained justifications of lease-financing, but in revision of outmoded pub-

lic debt limitations." If our provision for debt limitation is thought to be outmoded and our pay as you go policy no longer in keeping with the times, the provision should be abandoned by the electors of the state and not by the courts. The wisdom of it is their concern, not ours.

In State of Washington ex rel. Washington State Building Financing Authority v. Yelle, supra, the Washington Supreme Court wrote: "We recognize the housing problem with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking in order to assist the state in its problem. We can not close our eyes to what is actually being attempted." In this summary I wholeheartedly concur. Accordingly, I would deny the motion to dismiss and grant the requested writ of prohibition.

BIEGELMEIER, Presiding Judge (dissenting).

I concur with the dissent of Judge Rentto, and am impelled to comment further. If, instead of appropriating $1,325,000 (the actual cost) to build the facilities, the legislature may constitutionally create an arm of state government to do so and finance them from proceeds of bonds in that amount to be paid over a 25-year period for a total cost of $2,460,590 on the assumed 4% interest rate stated in the proposed construction lease ($2,886,423 on the 5½% rate in the Building Authority Resolution authorizing the bonds), then it is for it to make that choice. It is indeed for the legislature to determine the wisdom and expediency of a statute within its power to enact; it is the responsibility of courts to determine if the statute is within or without the constitutional authority of the legislature. Discussion of the statute and over 40 pages of single-spaced typewritten pages of resolutions, leases, bonds and other papers by which it is proposed the State Building Authority, the Boards of Regents and Charities and Corrections are to act to carry out the plan authorized by the statute under consideraion would require an extensive treatise. The majority opinion and Judge Rentto's dissent give the outline and purpose.

For purposes of discussion and assuming the Alice in Wonderland dividing of the State into three parties, we have the State, one of its Boards and a Building Authority it created on one side and the Bondholders on the other. The State created the Building Authority; the Building Authority causes a building to be erected (pays for it from proceeds of bonds it issues to Bondholders) then leases it to another State Board for a fixed sum of money which is required to be paid to the Building Authority out of appropriations to be made and taxes levied by later legislatures, which money in turn is then paid over to the Bondholders by the Building Authority thus completing the cycle. Drawing the veil from this ingeniously contrived cycle, the State erects a building, initially pays for it by issuing bonds and pays them out of what is called rents for a building it owns but which are appropriations made and taxes levied over a period of 25 years.

Section 1 of Art. XVII of the South Dakota Constitution provides, "No corporation shall be created   *   *   *   by special laws, except those for charitable, educational, penal or reformatory purposes, which are to be and remain under the patronage and control of the state". This Building Authority was so specifically created. Its officers are appointed by the Governor, it is authorized only to erect buildings for state purposes as the legislature shall by law direct. It must therefore be held to be a part of an arm of the State, its alter ego. The statute so reads and no one has otherwise contended. It is hornbook law one cannot do indirectly what one cannot do directly. The two parties involved are in reality the State and the Bondholders. Therefore it is a bond of the State payable, as the Resolutions provide, out of future appropriations and taxes.

I am mindful the Bond states it is payable "solely from the revenues derived from" a college classroom, auditorium building and training school kitchen and dining facility, and also the bond "shall not constitute an obligation of the State of South Dakota within the meaning of any provision of the Constitution or Statutes of the State" as the statute similarly declares. The last quoted clause is a self-serving declaration of no effect as

the legislature has no authority to so declare and it seems an anomaly for a person or a state to borrow money and state in its "Bond" that the borrower "for value received hereby promises to pay to the bearer * * * the principal sum of Five Thousand Dollars ($5,000.)" even though it be out of special funds and yet not be held to be an obligation or debt of the borrower.

I for one do not believe the legislature which passed the Act ever expected the State would permit default to occur in payment of these bonds. Neither the legislature nor the people of this state would countenance default as morally (and perhaps legally) the State is bound to see that general appropriations are made to pay the bonds as they become due. This is the whole tenor of the Act and the general consensus of the public and financial world. Brokers who buy, sell and deal in these bonds advertise that the principal source of payment of "both these bonds and the State's general obligations is the same: appropriations from the State legislatures" and those bodies "have provided a clear record of financial support" for them.

The majority opinion refers to cases based on the special fund doctrine, but I conclude it does not rest the opinion on that doctrine. It could hardly do so because in none of those cases were the projects to be paid for out of taxes or appropriations, for in Nissen the buildings were to be paid for out of rents from college students; in Mettet from bridge tolls from users and in Clem from rentals paid by a private corporation. The cited In re State Warrants dealt with an appropriation out of taxes levied for the current year and constructively in the treasury, hardly applicable here where the obligation provides for appropriations for 25 years in the future.

Judge Rentto's opinion disposes of the taxes—rental device. I cannot subscribe to the view the agreement here to pay rent is not a debt—true, it is not due today, but no business will treat it as casually as the majority does. A lease for $3,650 a year due January 1st is an accrued debt of $3,640 on December 31st in any present day business or financial statement. Under such

leases or contracts can it be said a person is free of debt on one day and in debt or perhaps bankrupt the next? That conclusion does not appear sound to me.

The record further shows the two Boards, pursuant to a request of the Authority, have passed resolutions authorizing and directing its officers to transfer to it described real estate owned by the State at the two institutions involved and also shows the instrument by which the transfer is to be made as permitted by § 4 of Ch. 276, Laws of 1967. The buildings are to be constructed on this property which is to be subject to the obligation in the bonds. Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1, expressly held an attempt to make income from property presently owned by the State was a pledge of additional property and resources of the State which created a debt within the meaning of that term as used in the constitutional provision and thus impermissible.

Reasons for liberal and broad interpretations of the national constitution are not persuasive as to our state constitution. The people have amended it and approved incurring added debt when they deemed it necessary or desirable; in two instances they approved incurring debts of six (1920) and thirty million dollars (1948). These actions confirm the observations made in the constitutional convention debates in support of this limitation that our constitution was easily amended and the convention should go cautiously before saddling a debt on the people without submitting it to a vote. Vol. II, p. 497. That was the philosophy obtaining in this court in Boe v. Foss, supra, when it wrote:

> "If as some sincerely believe these organic debt limitations are unrealistic and hampering progress, the appeal must be to the sovereign people. To amend the constitution is not a function of the courts."

It remains my philosophy at this time.

I am authorized to state RENTTO, J., concurs in this dissent.