FREDERICK AYER, JUNIOR, & others *vs.* COMMISSIONER OF ADMINISTRATION & others.

Suffolk. December 11, 30, 1959. — March 23, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Constitutional Law,* Borrowing by Commonwealth. *Massachusetts State Office Building Association. Commonwealth,* Borrowing, Creature of Commonwealth, Lease, Massachusetts State Office Building Association. *Corporation,* Corporate entity, Nonprofit membership corporation.

The provisions of St. 1958, c. 603, establishing the Massachusetts State Office Building Association as a "nonprofit membership corporation" for the sole purpose of constructing a State office building on land to be acquired by it and of leasing the building to the Commonwealth, authorizing the Association to borrow up to a specified large sum and to secure such indebtedness by a pledge of the rentals to be paid by the Commonwealth, and requiring that the building become the property of the Commonwealth upon discharge of all the Association's obligations, together with the terms of a "contract of lease" authorized by the statute and providing, among other things, for a rental in a specified annual amount plus an "additional rent" sufficient to discharge "any and all claims against the lessor for which the lessee as sovereign would be liable, were it the owner," showed that the Association was in substance a mere intermediary or device to carry out essentially a State operation involving borrowing by the Commonwealth, although the Association was a separate entity from the Commonwealth and the statute declared that the obligations of the Association should not "constitute a debt" or "a pledge of the faith and credit" of the Commonwealth; and, since the statute was not enacted by the yeas of two thirds of each branch of the Legislature present and voting, it was void as in violation of art. 62, § 3, of the Amendments of the Massachusetts Constitution. [590–591, 592–593, 597–598]

Legislative declarations as to the effect of a statute cannot save it from being held unconstitutional if, contrary to such declarations, its natural and reasonable effect shows it to be unconstitutional. [593]

The constitutionality of a statute is not supported merely by the recent enactment of similar legislation not yet tested constitutionally. [595]

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on October 7, 1959.

The case was reserved and reported without decision by *Counihan, J.*

The case was argued in December, 1959, before *Wilkins, C.J., Spalding, Counihan, Whittemore, & Cutter,* JJ. and afterwards was submitted on briefs to all the Justices.

*Calvin P. Bartlett, (Herbert P. Gleason* with him,) for the petitioners.

*Edward O. Proctor, (Richard Ely & Alan L. Lefkowitz* with him,) for the respondents Massachusetts State Office Building Association and others.

*Edward J. McCormack, Jr.,* Attorney General, *(Joseph H. Elcock, Jr.,* Assistant Attorney General with him,) for the respondents Commissioner of Administration and another.

WILKINS, C.J. The petitioners are thirty taxable inhabitants of the Commonwealth, no more than six of whom are from any one county. The respondents are the Commissioner of Administration, the Treasurer and Receiver General, Massachusetts State Office Building Association (a corporation created by St. 1958, c. 603), and the three members and directors of the Association. This petition is brought pursuant to G. L. c. 29, § 63, inserted by St. 1937, c. 157,[1] to prevent the commissioner and the Treasurer and Receiver General from expending money and incurring certain obligations. Declaratory relief is also sought. G. L.

---

[1] "If a department, commission, board, officer, employee or agent of the commonwealth is about to expend money or incur obligations purporting to bind the commonwealth for any purpose or object or in any manner other than that for and in which such department, commission, board, officer, employee or agent has the legal and constitutional right and power to expend money or incur obligations, the supreme judicial or superior court may, upon the petition of not less than twenty-four taxable inhabitants of the commonwealth, not more than six of whom shall be from any one county, determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such right and power."

c. 231A, § 6, inserted by St. 1945, c. 582, § 1. The case is reserved and reported without decision by a single justice upon a case stated.

In issue is the constitutionality of St. 1958, c. 603, entitled "An Act incorporating the Massachusetts State Office Building Association as a non-profit membership corporation for the purpose of constructing a State office building to house various departments, commissions and agencies of the Commonwealth." It was passed to be enacted by the House of Representatives on September 30, 1958, and by the Senate on October 1, 1958. This action was without "a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon." See § 3 of art. 62 of the Amendments to the Constitution. The act, carrying an emergency preamble, was approved by the Governor on October 3, 1958, and, if valid, became effective at once.

On September 2, 1959, the Commonwealth, acting by the commissioner, and the Association, acting by its president, entered into a so called "contract of lease," purportedly in accordance with St. 1958, c. 603. The following day the document was approved by the Governor and Council. The commissioner and the Treasurer and Receiver General are each about to expend money raised, or to be raised, by the general taxation of the inhabitants of the Commonwealth and to incur obligations purporting to bind the Commonwealth pursuant to the "contract of lease." The Association and its members and directors are about to pledge as security, for the purpose of borrowing money, rentals payable under the "contract of lease" by the Commonwealth to the Association, to enter into a trust agreement to borrow money by pledging rentals, and to issue and sell bonds whose repayment is secured by a pledge of rentals.

It is agreed that an actual controversy has arisen between the parties as to the constitutionality of c. 603 and the validity of the "contract of lease," and that all persons necessary for a determination by way of declaratory relief are made parties.

We first must outline the statute at some length. Anthony N. DiNatale, William F. Callahan, and Otis M. Whitney, and their successors, are "made a corporation, by the name of Massachusetts State Office Building Association . . . for the purpose of constructing a state office building, to contain not less than five hundred thousand square feet of office space, for office, restaurant, garage, meeting and other like facilities for the use of the commonwealth . . . ." The building is to be constructed in the vicinity of the State House and the Suffolk County court house in an area which is "a part of the government center project, so called" (§ 1). The named incorporators and their successors shall constitute the members of the Association and its board of directors. A vacancy is filled by the remaining members with no limitation except that there shall not be three members of the same political party. If there are no remaining members capable of acting, successor members are to be appointed by the Commissioner of Corporations and Taxation subject to the same limitation (§ 4).

The directors shall elect a president and a clerk from their own number, and "shall appoint a treasurer and such other officers as they deem necessary, and may prescribe their duties and fix their tenure of office and compensation. No funds of the Association shall be paid to or distributed among its members other than as reimbursement for their actual expenses reasonably and necessarily incurred in the discharge of their duties . . ." (§ 5). The Association may employ, and fix the compensation of, engineers, architects, attorneys, accountants, experts, and advisers (§ 6). It may hold real and personal property in such amount as the directors may deem necessary or desirable for the purposes for which it was created, and after a lease with the Commonwealth shall have been entered into and the Association's bonds shall have been issued, it may take property, both public and private, by eminent domain (§ 7). The Commonwealth, acting through the Commissioner of Administration, may enter into a "contract of lease" with the Association, the building to become the property of the

Commonwealth upon the payment of all obligations of the Association (§ 8). Apart from certain easements, the Association shall have no power to dispose of or encumber the property except by the "contract of lease" with the Commonwealth (§ 9).

The Association may borrow not more than $30,000,000, the loan to be represented by bonds or other evidences of indebtedness issued under a trust agreement, and for their payment may pledge the rentals from the Commonwealth which are to be subject to a first lien in favor of bondholders. The terms and price of sale of the bonds shall be as determined by the Association "to be for the best interests of the Association." The bonds are not subject to the Sale of Securities Act, G. L. c. 110A (§ 10). "No bonds or other evidences of indebtedness . . . shall constitute a debt of the commonwealth or a pledge of the faith and credit of the commonwealth, but . . . shall be payable solely from the funds of the Association" (§ 14). The Association shall not be required to pay taxes or assessments upon the building, and the bonds or other evidences of indebtedness, their transfer and the income from them (including any profits made on their sale) shall be free from taxation by the Commonwealth (§ 11). Until the building has become the property of the Commonwealth, the Association shall pay $200,000 annually to the city, the first payment to be made in the year in which it shall first receive the proceeds of any borrowing, other than a temporary loan in anticipation of permanent financing (§ 12).

We note that the act contains no provision for financial accountability, and that no means are prescribed for supervising the awarding and the performance of the building contract under safeguards similar to those in G. L. c. 7, §§ 30A–30J, inserted by St. 1953, c. 612, § 5, and as amended, and G. L. c. 149, §§ 44A–44L.

The petitioners, in attacking the statute upon a variety of constitutional grounds, make the following contentions: (1) There has been a violation of § 3 of art. 62[1] of the

---

[1] Article 62, § 1. "The credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed."

Amendments to the Constitution of the Commonwealth, in that the statutory scheme is in substance a borrowing of money by the Commonwealth without a vote, taken by the yeas and nays, of two thirds of each house of the General Court present and voting. (2) If the Association is construed to be a corporation which is privately owned and managed, (a) there has been a violation of § 1 of art. 62 [1] in that there is authorized a loan of the credit of the Commonwealth; and (b) there is authorized a delegation of the executive power of expenditure in violation of arts. 6 and 7 of the Declaration of Rights. (3) If the members of the Association are public officers, the portions of the statute relating to their appointment, tenure, and succession violate arts. 5, 6, 7, 8, and 18 of the Declaration of Rights and Part II, c. 1, § 1, art. 4, of the Constitution. (4) There is a delegation of the legislative power of appropriation in violation of art. 30 of the Declaration of Rights.

Since we are of opinion that the first ground must be upheld, we shall confine our discussion to that ground. In so doing, we make no intimation as to the validity of other objections.

Article 62 was adopted in 1918 following the Constitutional Convention of 1917–1918. See *Opinion of the Justices*, 337 Mass. 800, 807–808. It was aimed at borrowing by the Commonwealth. A study of the proceedings of the convention, and a fair reading, as a whole, of the pertinent portions of the debates (vol. 3, pp. 1217–1234) show that the purpose was to put "fetters on the . . . Legislature" (p. 1233).[1] It was pointed out that in forty-four States of

§ 2. "The commonwealth may borrow money to repel invasion, suppress insurrection, defend the commonwealth, or to assist the United States in case of war, and may also borrow money in anticipation of receipts from taxes or other sources, such loan to be paid out of the revenue of the year in which it is created."

§ 3. "In addition to the loans which may be contracted as before provided, the commonwealth may borrow money only by a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon. The governor shall recommend to the general court the term for which any loan shall be contracted."

§ 4. "Borrowed money shall not be expended for any other purpose than that for which it was borrowed or for the reduction or discharge of the principal of the loan."

[1] See closing statement of Mr. Parkman of Boston, of the committee on State finance: "The gentleman from Worcester (Mr. Hobbs) has said that this is putting fetters on the State Legislature. It is. That is just what it is

the Union there was some constitutional restriction on the contracting of debts or loans by the State (pp. 1221–1222). It was said that this Commonwealth, which was one of the four . having no such restriction, had the second highest State debt, which was increasing out of proportion to population and out of proportion to valuation (p. 1223).

If the Commonwealth itself were to borrow on bonds issued by it for the purpose of erecting an office building, this could be done "only by a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon." Section 3 of art. 62 of the Amendments to the Constitution. The question is whether this is substantially the situation presented by the corporation created by St. 1958, c. 603, and the "contract of lease." Stated in another way, has this somewhat elaborate statute created an entity sufficiently apart from the Commonwealth itself to avoid being classified as "colorable" or as a "subterfuge to evade the provisions of art. 62, § 3," when the scheme embodied in it is viewed as a whole? See *Opinion of the Justices*, 322 Mass. 745, 752.

The respondents argue that the borrowing by the Association is not a borrowing by the Commonwealth, because the Association has a genuine existence of its own which is distinct from the existence of the Commonwealth.

As the title of the act shows, the Association is incorporated "as a non-profit membership corporation,"[1] a classification not to be found under that name in the General Laws, but most nearly resembling corporations formed for charitable and certain other purposes. See G. L. c. 180. See also G. L. c. 158.

We agree that the Association is a separate entity. It can contract and issue bonds. It can sue and be sued. But these attributes are not enough to meet the present consti-

for. That is why we should do it. We do not say anything about the past. Let the dead past bury its dead. But in the future let us establish a good financial arrangement for the Commonwealth; pay as you go and contract as little debt as possible" (p. 1233).

[1] See Consolidated Laws of New York c. 35, "Membership Corporations Law." The term "means a corporation not organized for pecuniary profit" (§ 2).

tutional challenge. This is because we think that, viewing the project as a whole, the Association is nothing more than a mere intermediary to carry out only one purpose.

The Association exists only for the purpose of constructing and "leasing" to the Commonwealth a building for the exclusive use of the · Commonwealth, its boards, departments, commissions, officers, and employees. This building is to be near the State House, and underground passageways connecting with the State House and other public buildings are authorized (§ 1). The Association has broad power to take by eminent domain both public and private property (§ 7). The building, at first to be "leased" to the Commonwealth, will become its absolute property upon the payment of all the Association's obligations (§ 8). The Association cannot "sell, lease, mortgage, pledge or otherwise dispose of or encumber" its property except as expressly provided in the act and except for easements of no present importance (§ 9). The only express provision of this sort is that, in order to pay the amount to be borrowed, not in excess of $30,000,000, the "rentals" receivable under the lease may be pledged without physical delivery and the pledge will be effective against other creditors of the Association. There is a provision for bonds or other evidences of indebtedness (hereinafter called bonds) to be issued under a trust instrument, the terms of which are not set forth (§ 10), but which are to be payable solely from the "funds" of the Association (§ 14).

The act provides that the bonds shall not constitute a debt of the Commonwealth or a pledge of its faith or credit (§ 14). This disclaimer is ineffective if, contrary to the disclaimer, such be the natural and reasonable effect of the statute. *Commonwealth* v. *Moore,* 214 Mass. 19, 25. *Mueller* v. *Commissioner of Pub. Health,* 307 Mass. 270, 275. Likewise, it is not decisive that St. 1958, c. 603, does not describe the Association as "a body politic and corporate" or as "a public instrumentality" or cause it to be "placed" in a State department. That it has no power to make rules and

regulations is irrelevant on the question whether it has an identity independent of the Commonwealth.

The respondents in their supplemental brief concede (1) that "the only certain source of funds to pay for the project is to be the sale by the Association of its bonds or other evidences of indebtedness"; and (2) that "the only certain source of income available to the Association for repayment of its borrowing and interest thereon is the rentals to be paid by the Commonwealth for occupation and eventual acquisition of the building." Viewing realities, we consider that the so called "rentals" are not really rentals at all, but in practical effect are instalment payments on account of a purchase by the Commonwealth of an office building, with full title to be acquired at an indefinite future date. In the circumstances, we pass over, as not in point, the rule that, before the day arrives upon which rent is covenanted to be paid, rent is not a debt for it is then neither due nor payable. See *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 310 Mass. 769, 772–773, and cases cited. A reading of the statute gives no hint of an approximate, much less a probable, date of acquisition of full title by the Commonwealth. Still the single restricted function of the corporation emphasizes its temporary existence. The more expeditious the achievement of its sole purpose, the sooner will be its demise.

The only other feature of the act providing any clue to the duration of corporate life is the $30,000,000 limit of borrowing. Much is left to the discretion and judgment of the members which inevitably must be affected by such matters as building costs, conditions of the bond market, rates of interest, and what annual payment the Commonwealth reasonably should make. Fair rental value is not a factor. In substance, the corporation is a device for payments by the Commonwealth to bondholders, who, unlike the usual bondholder, have no claim against the corporation's assets, but instead are the beneficiaries of an anomalous statutory pledge, without delivery of possession, of all the "rental" payments.

In order to establish an existence for the Association dis-

tinct from the Commonwealth, the respondents rely upon cases relating to organizations which differ from the Association in substantial respects. *Johnson-Foster Co.* v. *D'Amore Constr. Co.* 314 Mass. 416, 419. *Opinion of the Justices,* 322 Mass. 745, 752 (housing authorities). *Opinion of the Justices,* 334 Mass. 721, 734, 738 (Massachusetts Port Authority). *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester,* 337 Mass. 23, 26, n. 6 (Gloucester Community Pier Association, Inc.). *Waite Hardware Co.* v. *Ardini & Pfau, Inc.* 339 Mass. 634, 637 (Massachusetts Turnpike Authority). These entities all exist for more than a single, temporary purpose. They perform services for others than the sovereign itself. They acquire income from those for whom their services are performed: the Gloucester pier association from sublessees; the housing authorities from tenants; and the port and turnpike authorities from users of their facilities.

The respondents make an argument that legislative precedents support St. 1958, c. 603, and they refer to the college building association acts. St. 1939, c. 388, as amended (Massachusetts State College Building Association). St. 1946, c. 428 (Lowell Textile Institute Building Association). Giving no intimation either way, we merely indicate that their validity has never been presented to judicial scrutiny. We nevertheless note that students' fees are a source of income.

A charge of constitutional violation is not repulsed by the mere allegation of recent legislative precedents. "An unconstitutional law cannot be made valid by the laches of anyone or by any lapse of time." *Sears* v. *Treasurer & Receiver Gen.* 327 Mass. 310, 326–327. *Fairbank* v. *United States,* 181 U. S. 283, 311. There is nothing in the situation confronting us remotely resembling that discussed in *Holmes* v. *Hunt,* 122 Mass. 505, 516. If the safeguards adopted by the people in § 3 of art. 62 of the Amendments to the Constitution have not been observed, it is our duty so to declare. *Prescott* v. *Secretary of the Commonwealth,* 299 Mass. 191, 196. *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230,

243, 246. *Sears* v. *Treasurer & Receiver Gen.*, *supra*, 320, 322. This we state, mindful of the principle that all rational presumptions must be made in favor of the validity of every legislative enactment. *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138–139.

An examination of the "contract of lease" discloses much of significance in determining the nature of the transaction confronting us. This document provides that the lessor is to acquire title to all the area prescribed in the statute except land of the Commonwealth, to clear the area, "and to use its best efforts to cause the leased property to be substantially completed and ready for occupancy on or before July 1, 1962." There is a general description of the building, which is to be at least sixteen stories above the main lobby and is to contain not less than 500,000 square feet of space for office and other facilities.

Other provisions of the "contract of lease" show the extraordinary latitude which the representatives of the Association, as lessor, and of the Commonwealth, as lessee, were accorded by the statute to carry out its objectives. The lease is to run for the term of twenty-three years ending June 30, 1985, unless sooner terminated or extended according to its terms. The annual rent is to be $2,500,000 plus "additional rent," a comprehensive term which embraces "all amounts required to satisfy and discharge any and all claims against the lessor for which the lessee as sovereign would be liable, were it the owner," all taxes assessed against the lessor, and the defence of the lessor against tax liabilities. No rent is payable for the period from September 2, 1959, to July 1, 1962. If the building shall not be completed by the latter date, or, before occupation, shall be destroyed or damaged, the rent is not to abate, either wholly or partly, and the lessee is to have no claim against the lessor and is to be relieved of none of its obligations; but the lessor shall proceed to complete the project with all practicable dispatch, and if not with dispatch satisfactory to the lessee, the lessee shall have the right to complete or restore the building itself and to apply

all funds of the lessor available for the purpose. The lessee is to have exclusive control of all property within the area. After the commencement of occupation the lessee shall have the right to add to the property, and the lessor shall not be obligated to repair, pay operating expenses, or furnish heat or utilities.

The "contract of lease shall take effect when and only when" the lessor shall have issued, pursuant to c. 603, § 10, bonds secured by assignment of the lessor's right to receive and collect rents, and shall terminate when the corporate trustee has sufficient funds for the payment in full of all obligations of the bonds. If the obligations of the bonds have not been paid or provided for, "the term of this lease shall not end on June 30, 1985, but shall ipso facto be extended at the same annual rental for one year to June 30, 1986, and shall be further so extended thereafter from year to year until payment in full as aforesaid shall have been made or provided for."

For emphasis, we restate important features of the "contract of lease." It creates the obligation to pay at least $2,-500,000 annually for twenty-three years, more or less. The additional rent, although indefinite in amount, is bound to be substantial. So will be the operating expenses. Hence, there is a series of very large payments of money, the sum of which has been arrived at without the setting of any legislative standard and merely upon the joint determination of the commissioner and the Association. Contingent upon the issue of bonds, rent is to become payable after July 1, 1962, irrespective of whether the building is ready for occupancy. The "lease" will terminate upon the indefinite future date when the "rent" payments shall have been sufficient to discharge the obligations of the Association.

The statute and the "contract of lease" which it permits, when scrutinized together, have all the earmarks of a State operation. The members of the Association appear to be public officers, although our decision need not rest upon that fact. *Clinton Housing Authy.* v. *Finance Comm. of Clinton,* 329 Mass. 495, 499. *Alphen* v. *Shadman,* 330 Mass. 608,

609.   The reference to bi-partisan membership looks in the same direction.

We conclude that the statute violates § 3 of art. 62 of the Amendments to the Constitution, and is void upon its face. "To hold otherwise would be to exalt artifice above reality." *Gregory* v. *Helvering,* 293 U. S. 465, 470.   See *Palace Theatre* v. *United States,* 148 F. 2d 30 (7th Cir.); *Limerick's, Inc.* v. *Commissioner of Internal Revenue,* 165 F. 2d 483 (5th Cir.); *W. H. Armston Co. Inc.* v. *Commissioner of Internal Revenue,* 188 F. 2d 531 (5th Cir.); *58th St. Plaza Theatre, Inc.* v. *Commissioner of Internal Revenue,* 195 F. 2d 724 (2d Cir.). The policy of looking through form to the substance of a transaction is at least as strong in applying a constitutional mandate as in construing a tax statute.   As in the tax cases just cited, no genuine independent business purpose for certain lease transactions could be discovered, so here we must pronounce the device of the office building association and the "contract of lease" to be a violation of art. 62, § 3.   See *State* v. *Volusia County School Bldg. Authy.* 60 So. 2d 761[1] (Fla.); *Reynolds* v. *Waterville,* 92 Maine, 292; *Opinion of the Justices,* 146 Maine, 183, 188; *McCutcheon* v. *State Bldg. Authy.* 13 N. J. 46, 62; *State Office Bldg. Comm.* v. *Trujillo,* 46 N. M. 29, 51–52; *Washington* v. *Yelle,* 47 Wash. 2d 705, 715; Magnusson, Lease-Financing by Municipal Corporations as a Way Around Debt Limitations, 25 Geo. Wash. L. Rev. 377; Morris, Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions, 68 Yale L. J. 234.

There remain to mention certain miscellaneous points raised by the respondents.   They argue in their brief, "It would certainly be a strained interpretation to put upon the act, that the Commonwealth was to be both landlord and lessee of the office building, represented in its capacity as landlord by the Association, composed of the Commonwealth's own officers."   We do not make that interpretation.   We hold that the creation of the Association to

---

[1] The facts are more fully set forth in *State* v. *Board of Control,* 65 So. 2d 469, 473 (Fla.).

execute the "contract of lease" is merely one phase of an integrated plan of which the substantial result is constitutional evasion. This also disposes of the respondents' assertion that "under the present statute the Commonwealth is to pay money to the Association for a consideration, and that as soon as the money is paid it ceases to be public funds."

The respondents refer to a practice of the Commonwealth of making contracts which call for payments over a course of years, and specifically mention construction contracts and leases of premises by State departments. G. L. c. 8, § 10A, as amended through St. 1955, c. 317, § 1. This practice cannot affect the matter before us. We do not accept the premise that the present transaction, because in form a lease, is proof against constitutional attack. Nor can § 10A be taken as authorizing a violation of constitutional safeguards.

A final decree is to be entered which (1) declares that St. 1958, c. 603, is invalid as violative of § 3 of art. 62 of the Amendments to the Constitution of the Commonwealth; and (2) enjoins the respondents from expending money, incurring obligations, or doing any act pursuant thereto.

*So ordered.*