ADVISORY OPINION ON CONSTITUTIONALITY OF 1976 PA 240

Docket No. 58691. Submitted January 5, 1977 (Calendar No. 14).—
    Decided May 25, 1977. Opinions filed June 10, 1977.
    The Supreme Court granted a request by the Legislature for an
    advisory opinion on the constitutionality of 1976 PA 240 (En-
    rolled Senate Bill 558) which amends the state building author-
    ity act. *Held:*
        1. The state may lease property from the State Building
    Authority under the act and validly contract to pay rental over
    a period of years. Unless the Constitution contains limitations,
    the Legislature has the general power to contract; the only
    office of the limitations in Const 1963, art 9, §§ 12, 15 is to limit
    the power of the Legislature to borrow money and issue evi-
    dence of debt thereby incurred. The obligation to pay rent
    under a lease does not involve borrowing, and therefore the
    state is not precluded from leasing property by those provi-
    sions.
        2. Future legislatures will be contractually bound to appro-
    priate the necessary public funds to meet the state's rental
    obligation made under the act. However, the state's waiver of
    sovereign immunity by granting limited jurisdiction to the
    Court of Claims over all contract claims against the state is

REFERENCES FOR POINTS IN HEADNOTES
[1, 5] 16 Am Jur 2d, Constitutional Law § 228.
    40 Am Jur 2d, States, Territories and Dependencies § 40.
[2] 72 Am Jur 2d, States, Territories and Dependencies §§ 73, 74.
[3, 13] 72 Am Jur 2d, States, Territories and Dependencies §§ 78, 80.
[4, 8] 72 Am Jur 2d, States, Territories and Dependencies § 84.
[6] 20 Am Jur 2d, Courts § 33.
[7, 18] 64 Am Jur 2d, Public Securities and Obligations § 13.
[9] 71 Am Jur 2d, State and Local Taxation § 73.
[10] 20 Am Jur 2d, Courts § 75.
[11, 12] 20 Am Jur 2d, Courts § 189.
[14] 16 Am Jur 2d, Constitutional Law § 111.
[15] 64 Am Jur 2d, Public Securities and Obligations § 38.
[16] 64 Am Jur 2d, Public Securities and Obligations §§ 132–135.
[17] 64 Am Jur 2d, Public Securities and Obligations § 105.
[19] 64 Am Jur 2d, Public Securities and Obligations § 42.

subject to legislative revocation and the Court of Claims may award damages but it is without equitable powers.

3. Only general obligation bonds are limited by Const 1963, art 9, §§ 12, 15. It is the state's pledge of its general taxing power to repay bonds issued for borrowed money which is limited by the Constitution and not the state's commitment of its general taxing power to meet the state's ordinary annual expenses and contract obligations. Revenue bonds and special obligation bonds are not within the ban of these sections. The bonds contemplated by the act purport to be revenue bonds, payable only from the revenue generated by the payment of "true rental" under the terms of the lease. No undertaking on the part of the state to pay the bonds is authorized and a disclaimer of a pledge of the state's general credit is required by the act. The contractual obligation of the state to make lease payments is not a promise to pay the bonds. The revenue bonds are secured and repaid by the users of the project financed.

Act declared constitutional.

Justice Coleman, joined by Justice Blair Moody, Jr., concurred with the Chief Justice but also wrote separately to emphasize that an advisory opinion offers the Court's advice, counsel and guidance upon the request of the Legislature or the Governor. Because the Court has no facts against which legislation under scrutiny can be tested, it must look only to the face of the enactment. Individual or collective judicial perceptions of the merits of the act are irrelevant to the task and provide no basis upon which to overcome the presumption which clothes all legislation. An advisory opinion does not constitute a decision of the Court and does not forever bind the Court (or even the signing justices) to a particular position. Without a case or controversy, the Supreme Court can only offer counsel based on assumptions concerning how the questioned statute would operate once effective and that it will be constitutionally applied. Were a case to show that the legislation was being improperly applied or used to avoid improperly a constitutional restriction, Justice Coleman would not feel restricted by what the Court said in an advisory opinion on the constitutionality of the legislation.

Justice Ryan, dissenting, concluded that the act is unconstitutional because it is an attempt to tax the people of the State of Michigan to pay off a long-term debt without their direct approval and the manifest intent and effect of the act is to evade constitutional limitations on debt. Many aspects of the relationship between the state, the State Building Authority,

and the bondholders have been left vague and indefinite, subject to later negotiation and agreement. Rendering an opinion on the constitutionality of the act in these circumstances invites speculation and blanket statements of uncertain application. An expression of the Supreme Court that the act is constitutional without reference to the possible applications is inappropriate because it will certainly excite the market for State Building Authority bonds and potential purchasers of the bonds will rely on the Court's opinion. The essential function of the State Building Authority is to borrow money to acquire buildings solely for use by the state. Bonds dependent on the public treasury and in turn upon the general taxing power of the state for their sole source of payment are not revenue bonds, regardless of how they are labelled. The act purports to authorize arrangements—deferred sales—which would result in transgressions of the constitutional borrowing limitations. The complicated scheme contained in the act does not place sufficient distance between the state and the debt to allow the state to avoid going to the people for a vote.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW—LEGISLATURE—LIMITATIONS.

The Michigan Constitution is not a grant of power to the Legislature as is the United States Constitution, but rather, it is a limitation on general legislative power.

2. CONSTITUTIONAL LAW—LEGISLATURE—LIMITATIONS—CONTRACTS.

The Legislature has general power to contract unless the Constitution contains limitations on the power.

3. CONSTITUTIONAL LAW—LEGISLATURE—BORROWING LIMITATIONS— STATE INDEBTEDNESS.

The only office of the constitutional limitations on state indebtedness is to limit the power of the Legislature to borrow money and issue evidence of the debt thereby incurred (Const 1963, art 9, §§ 12, 15).

4. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—STATE INDEBTEDNESS—BUILDING AUTHORITY ACT—LANDLORD AND TENANT.

The obligation of the state to pay rent under a lease from the State Building Authority under the building authority act does not involve borrowing; consequently the lease does not result in the incurring of a debt as that word is used in constitutional limitations on incurring debts (Const 1963, art 9, §§ 12, 15; 1976 PA 240).

5. CONSTITUTIONAL LAW—LEGISLATURE—STATE INDEBTEDNESS—BUILD-
      ING AUTHORITY ACT.

   Future Legislatures would be contractually obligated under the
      building authority act to appropriate amounts each year suffi-
      cient to pay periodic rentals to the State Building Authority for
      true rent falling due if the state leases property from the State
      Building Authority for a period of years (1976 PA 240).

6. COURTS—COURT OF CLAIMS—JURISDICTION—REMEDIES.

   The Court of Claims has jurisdiction to award damages in claims
      against the state but it is without equitable powers; parties who
      pursue their contract claims in that court are restricted in the
      nature of the remedy they may seek.

7. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BONDS—STATE
      INDEBTEDNESS.

   Only general obligation bonds are limited by the Constitution;
      revenue bonds and special obligation bonds are not within the
      constitutional ban (Const 1963, art 9, §§ 12, 15).

8. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BONDS—STATE
      INDEBTEDNESS—BUILDING AUTHORITY ACT.

   The contractual obligation of the state to make lease payments
      under the building authority act is not a pledge of the general
      obligation of the state to the repayment of the bonds contem-
      plated by the act even though the state's rental obligation will
      be paid from the general tax fund (Const 1963, art 9, §§ 12, 15;
      1976 PA 240).

9. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BONDS—STATE
      INDEBTEDNESS.

   The Constitution limits the state's pledge of its general taxing
      power to repay bonds issued for borrowed money and not the
      state's commitment of its general taxing power to meet the
      state's ordinary annual expenses and contract obligations
      (Const 1963, art 9, §§ 12, 15).

CONCURRING OPINION

COLEMAN and BLAIR MOODY, JR., JJ.

10. CONSTITUTIONAL LAW—COURTS—ADVISORY OPINION.

   *Individual or collective judicial perceptions of the merits of an act
      are irrelevant to the Supreme Court's task in giving an advis-
      ory opinion on its constitutionality and provide no basis upon
      which to overcome the presumption of constitutionality which
      clothes all legislation (Const 1963, art 3, § 8).*

11. CONSTITUTIONAL LAW—COURTS—ADVISORY OPINION—PRECEDENT.

   *An advisory opinion does not forever bind the Supreme Court (or even the signing justices) to a particular position; it does not constitute a decision of the Court and is not precedentially binding in the same sense as a decision on the merits (Const 1963, art 3, § 8).*

12. CONSTITUTIONAL LAW—COURTS—ADVISORY OPINION—PRECEDENT.

   *The lack of a case or precedent in an advisory opinion forces the Supreme Court to offer counsel based on assumptions that the legislation will be constitutionally applied; however, were a case to show that the legislation was being improperly applied or used to avoid improperly a constitutional restriction the Supreme Court would not be restricted by what it had said in an advisory opinion (Const 1963, art 3, § 8).*

DISSENTING OPINION

RYAN, J.

13. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BUILDING AUTHORITY ACT.

   *The building authority act purports to authorize arrangements—deferred sales—which would result in transgressions of the constitutional borrowing limitations (Const 1963, art 9, §§ 12, 15; 1976 PA 240).*

14. CONSTITUTIONAL LAW—ADVISORY OPINION—BUILDING AUTHORITY ACT.

   *An opinion advising in essence that the building authority act is constitutional without reference to the myriad applications is inappropriate because the opinion will certainly excite the market for building authority bonds and potential purchasers of the bonds can be expected to rely on it (Const 1963, art 3, § 8; 1976 PA 240).*

15. CONSTITUTIONAL LAW—BUILDING AUTHORITY ACT—ADVISORY OPINION.

   *The practical necessity of obtaining buildings of various kinds for use by the state, the merits of leasing as opposed to ownership, and the right of the state to issue bonds for the acquisition of necessary buildings if it does so consistent with the Constitution are matters of political, economic, social and general welfare belonging properly to the judgment of the Legislature and the Governor (Const 1963, art 3, § 8; 1976 PA 240).*

16. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BUILDING AUTHORITY ACT.

  *The complicated scheme contained in the building authority act—which creates a State Building Authority to acquire buildings and to issue bonds, which are only payable from rentals, payable by the state from general tax revenues—does not place sufficient distance between the state and the debt to allow the state to avoid going to the people for a vote as required by the Constitution (Const 1963, art 9, §§ 12, 15; 1976 PA 240).*

17. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BUILDING AUTHORITY ACT.

  *The sole purpose of the State Building Authority is to serve the government's building needs and in substance it acts as an agent of the government, assigned to acquire space by issuing bonds, and the state's general fund is the sole source of "revenue" to pay the principal and interest on the bonds; thus the State Building Authority's debt is in reality the state's debt under the borrowing limitations of the Constitution (Const 1963, art 9, §§ 12, 15; 1976 PA 240).*

18. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BONDS—STATUTE.

  *Bonds dependent on the public treasury and in turn upon the general taxing power of the state for their sole source of payment are not revenue bonds, which are excepted from the constitutional debt limitations; formal recitations in an act to the effect that it does not authorize an indebtedness of the state contrary to the Constitution may not be given precedence over the actual substance of the act (Const 1963, art 9, §§ 12, 15).*

19. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BUILDING AUTHORITY ACT.

  *The building authority act is in violation of the Constitution insofar as it authorizes a scheme to permit the State Building Authority to convey a building to the state when the bonds are paid off for no additional consideration or for a nominal fee, since this purported lease of the building is in fact debt financing of a capital asset (Const 1963, art 9, §§ 12, 15; 1976 PA 240).*

*Frank J. Kelley,* Attorney General, and *Robert A. Derengoski,* Solicitor General.

*Milton I. Firestone* and *Craig Atchinson,* Assist-

ants Attorney General, in support of constitution-ality.

*Thomas L. Casey,* Assistant Attorney General, opposing constitutionality.

KAVANAGH, C. J. Pursuant to the Legislature's request contained in House Concurrent Resolution No 691 and the letter of Governor Milliken dated August 24, 1976, we agreed to give an advisory opinion (Const 1963, art 3, § 8) on whether Act 183 of the Public Acts of 1964 as amended by Act 240 of the Public Acts of 1976 (MCLA 830.411 *et seq.;* MSA 3.447[101] *et seq.;* hereinafter "The Act") violates Const 1963, art 9, §§ 12 and 15.

We have been aided in this undertaking by the office of the Attorney General which has, in response to our request, submitted one brief supporting the conclusion of constitutionality, and one brief supporting the conclusion of unconstitutionality. We are grateful for this assistance.

We are of the opinion that The Act does not violate either § 12 or § 15 of art 9, Const 1963.

The specific questions asked are:

I

"May the state lease property from the State Building Authority under the provisions of Act No. 183 of the Public Acts of 1964, as amended by Act No. 240 of the Public Acts of 1976, and validly contract therein to pay the true rental value of the leased premises at fixed times over a period of years in light of Sections 12 and 15 of Article 9 of the State Constitution of 1963?"

We answer in the affirmative.

The Michigan Constitution is not a grant of power to the Legislature as is the United States

Constitution, but rather, it is a limitation on general legislative power. *In re Brewster Street Housing Site,* 291 Mich 313; 289 NW 493 (1939). Unless the Constitution contains limitations, the Legislature has general power to contract.

We are asked to address the limitations contained in Const 1963, art 9, §§ 12 and 15 which read as follows:

"Sec. 12. No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution."

"Sec. 15. The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

We are satisfied that the only office of these limitations is to limit the power of the Legislature to borrow money and issue evidence of the debt thereby incurred.

We reach this conclusion by our reading of these sections and the history of the limitations found in preceding Michigan Constitutions.

The 1843 amendment to the Constitution of 1835 provided that "every law authorizing the borrowing of money or the issuing of state stocks, whereby a debt shall be created on the credit of the state" would require a majority vote of the electorate in a referendum.

Const 1850, art 14, in § 3, specifically authorized the state to "contract debts to meet deficits in revenue" and limited the aggregate of such debts

to $50,000 at any one time, and in § 7 forbade the issuance of scrip, certificate, or other evidence of state indebtedness for any debts other than "as * * * expressly authorized" in the Constitution.

Const 1908, art 10, § 10 provided in part: "The state may contract debts to meet deficits in revenue, but such debts shall not in the aggregate at any time exceed 250,000 dollars". The ban on the issuance of scrip, certificate or other evidence of state indebtedness except for debts expressly authorized was continued.

We read the phrase "contract debts to meet deficits in revenue" in the foregoing to mean simply "borrow money".

The obligation to pay rent under a lease does not involve borrowing. Consequently it does not result in the incurring of a debt as that word is used in limitations thereon. See *Walinske v Detroit-Wayne Joint Building Authority,* 325 Mich 562; 39 NW2d 73 (1949), and cases cited therein. See also 56 Am Jur 2d, Municipal Corporations, §§ 660–665.

Accordingly we are of the opinion that neither § 12 nor § 15 of Const 1963, art 9, precludes the state from leasing property under the provisions of The Act.

## II

If under The Act the state may lease property from the State Building Authority, are future Legislatures contractually obligated to appropriate amounts each year sufficient to pay periodic rentals to the building authority for true rent falling due in future years?

We answer in the affirmative.

Implicit in our holding that the Legislature may

contract to lease for a period of years on behalf of the state without violating the borrowing limitations of art 9 is our recognition that future Legislatures will be contractually bound to appropriate the necessary public funds to meet the state's rental obligation. However, in that its power to invoke sovereign immunity can partially or even totally obstruct enforcement, the state differs essentially from non-governmental contractors. (See generally 72 Am Jur 2d, States, §§ 87–88). Although in granting limited jurisdiction over all contract claims against the state to the Court of Claims (MCLA 600.6401 *et seq.;* MSA 27A.6401 *et seq.)* the State of Michigan has waived its sovereign immunity, even that waiver is subject to legislative revocation.

The Court of Claims has jurisdiction to award damages but it is without equitable powers. Parties who pursue their contract claims in that court are therefore restricted in the nature of the remedy they may seek.

Nevertheless we are of the opinion that the enabling Legislature in the instant case does contractually oblige future Legislatures to provide adequate appropriations in order to satisfy the rental payments as due. See· *Nichols v State Administrative Board,* 338 Mich 617; 62 NW2d 103 (1954).

### III

Would the bonds to be issued pursuant to The Act by the building authority and repaid from proceeds derived from true rental payments by the state pursuant to lease constitute a state indebtedness within the meaning of §§ 12 and 15 of Const 1963, art 9?

We answer in the negative.

Only general obligation bonds are limited by §§ 12 and 15. Revenue bonds and special obligation bonds are not within the ban of these sections. *Schureman v State Highway Commission,* 377 Mich 609; 141 NW2d 62 (1966).

We do not regard the bonds contemplated by The Act as pledging the general obligation of the state to their repayment. They purport to be revenue bonds, payable only from the revenue generated by the payment of "true rental" under the terms of the lease. No undertaking on the part of the state to pay the bonds is authorized and a disclaimer of a pledge of the state's general obligation is required under § 8 of The Act.

We do not regard the contractual obligation of the state to make lease payments as a promise to pay the bonds. The nature of these bonds as true revenue bonds is not vitiated by the circumstance that the state's rental obligation will be paid from the general tax fund. We have regarded revenue bonds as exempt from the constitutional borrowing limitations not because state tax funds would never provide their repayment but rather because revenue bonds are secured and repaid by the users of the project financed.

It is the state's pledge of its general taxing power to repay bonds issued for borrowed money which is limited in article 9 and not the state's commitment of its general taxing power to meet the state's ordinary annual expenses and contract obligations.

WILLIAMS, COLEMAN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with KAVANAGH, C. J.

LEVIN, J., took no part in the decision of this case.

COLEMAN, J. I write separately to emphasize the

effect of an advisory opinion. It is one requested by
"either house of the legislature or the governor"
and offers the Court's advice, its counsel, its guid-
ance. Because there necessarily are no facts
against which such legislation can be tested, we
are obliged to look only to the face of the enact-
ment under scrutiny.

Individual or collective judicial perceptions of
the merits of the act are irrelevant to our task.
For instance, this act can be either a boon or a
burden to the people of Michigan, dependent
largely upon the fiscal restraint and wisdom of the
people's representatives, their legislators. How-
ever, that is no basis upon which to overcome the
presumption of constitutionality which clothes all
legislation.

No one should think that an advisory opinion
forever binds this Court (or even the signing jus-
tices) to a particular position. In footnote 1 to the
*Advisory Opinion re Constitutionality of 1972 PA
294,* 389 Mich 441, 461–462; 208 NW2d 469 (1973),
we said it "is important to emphasize the fact that
an advisory opinion does not constitute a decision
of the Court and is not precedentially binding in
the same sense as a decision of the Court after a
hearing on the merits". An advisory opinion "con-
stitutes the opinion of the several justices signa-
tory based upon the bare words of the act and
unadorned by any facts or combination of facts".
Also see *Advisory Opinion re Constitutionality of
1975 PA 227 (Questions 2–10),* 396 Mich 465; 242
NW2d 3 (1976). Without a case or controversy, we
can only offer counsel.

In *Advisory Opinion re Constitutionality of 1974
PA 242,* 394 Mich 41, 47; 228 NW2d 772 (1975), we
said the lack of a case or controversy forces us "to
make assumptions concerning how the questioned

statute would operate once effective". In addition to presuming that legislation is constitutional on its face, we also must assume that it will be constitutionally applied. However, legislation can be applied or misapplied, used or misused. Were a case to show that the legislation was being improperly applied or used to avoid improperly a constitutional restriction, I would not feel restricted by what the Court had said in an advisory opinion.

BLAIR MOODY, JR., J., concurred with COLEMAN, J.

RYAN, J. We have been asked to render an advisory opinion on whether 1964 PA 183 as amended by 1976 PA 240, MCLA 830.411 *et seq.;* MSA 3.447(101) *et seq.* (hereinafter "the Act"), violates article 9, §§ 12[1] and 15[2] of our 1963 Constitution.

The Act creates a "State Building Authority" for the purpose of constructing or otherwise acquiring buildings and related facilities which are to be leased to the State of Michigan to house the various departments, agencies and offices carrying out the public business. The Act authorizes the building authority to issue up to $400,000,000 of "revenue bonds" (excluding refunding bonds and notes) to pay the cost of acquiring the buildings. The Act requires that the interest and principal on such bonds be "payable solely" from the "true rentals" paid by the state under leases negotiated

---

[1] "No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution."

[2] "The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

with the authority. The bonds may be additionally secured by mortgages on the buildings. § 8.

The Act provides that both the leases and the bonds shall not exceed a life of 20 years and, in any event, the bonds must mature within 1 year of the last rental payment pledged for their payment. The Act authorizes the state's rentals to be paid directly to the paying agent for the bonds or trustee for the bondholders rather than to the lessor building authority. § 8.

The Act authorizes a receiver for the bondholders who may take possession of a building or buildings, maintain the properties, prescribe rents, and collect and apply income. § 8.

The Act requires that the bondholders be given a first lien on the rentals due from the state. It allows a direct action by bondholders against the state "to compel the performance of the duties of the state required by this act, the resolution, or the lease". § 9.

The Act requires the Governor and the budget director to include in the annual budget an amount sufficient to pay the rentals due from the state, and requires the state to pay the rentals in the time, place and manner specified in the lease or leases. § 7.

Upon payment of the bonds the authority may convey title to the buildings to the state on terms to be stated in the leases. § 6.

Upon careful examination of the legislation, it is evident that many aspects of the relationship between the state, the authority and the bondholders have been left vague and indefinite, subject to later negotiation and agreement. We are asked to express an opinion upon the constitutionality of the Act in a factual vacuum. We do not have before us the leases, board resolutions or contracts

particularizing the arrangements between the par-
ties and disclosing their real relationships under
the Act. For instance, the Act leaves the question
of who will maintain and operate the buildings to
be determined in the lease. § 6. The ultimate
disposition of the buildings, when the bonds are
paid off, is left to be spelled out in the lease. § 6.
Aside from a requirement that the bond maturity
schedules and the leases be approximately cotermi-
nous, the duration of both are merely required to
be less than 20 years. § 8. The time, manner and
place of rental payments is left to the lease. § 7.
The authority may or may not transfer the duty of
operating and maintaining the properties to the
state. § 6. The bondholders may wrest control of
the properties from the authority under certain
conditions to be determined by resolution of the
authority. § 8. The authority is authorized to re-
move itself as the conduit for funds moving from
the state to bondholders. § 8.

Rendering an opinion on the constitutionality of
the Act in these circumstances invites speculation
and blanket statements of uncertain application.
While three specific questions were put to us re-
specting the constitutionality of the Act, they are
so narrowly drawn and in fact so vague as to be
valueless vehicles to advise upon the constitution-
ality of the whole legislation which is, after all,
the real concern of the Governor and the Legisla-
ture. See *Advisory Opinion re Constitutionality of
1974 PA 272,* 393 Mich 916 (1975); *Advisory Opin-
ion re Constitutionality of 1972 PA 294,* 389 Mich
441; 208 NW2d 469 (1973) (opinion of LEVIN, J.).

For example, the first question posed is in es-
sence: may the state lease property from the au-
thority under the provisions of the Act consistent
with art 9, §§ 12 and 15 of the Constitution? It is

apparent that this question cannot be answered until one knows the terms of the proposed lease. Yet this Court is given none but the most general terms, as stated in the Act. Whether title to a building is to be conveyed to the state upon payment of the bonds and on what terms, is one of the most important considerations in determining whether a proposed arrangement is a lease or in fact a deferred sale. See *State v Doyle & Associates, Inc.,* 374 Mich 222; 132 NW2d 99 (1965). See also Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377 (1957). A deferred sale is a debt and would therefore be prohibited. Yet this Court does not and cannot know at this time the ultimate disposition of the building. These arrangements are to be contained in future leases. The Act, however, purports to empower the authority to make whatever arrangements it pleases regarding the disposition of the building after the bonds have been paid in full. § 6.

This Court's affirmative answer to the first question posed could reasonably be understood to be a blanket approval by this Court of *any* disposition authorized by the Act. Plainly, however, the Act purports to authorize arrangements—deferred sales—which would result in transgressions of the constitutional limitations of art 9, §§ 12 and 15.

Today's majority expression of the Act's constitutionality without reference to the myriad possible applications will certainly excite the market for building authority bonds. Underwriters, institutional investors and the general public, all potential purchasers of the bonds, will have the most authoritative "bond counsel opinion" available and can be expected to rely on it. When in the future the state and authority exercise the full extent of

the powers contained in the Act, will this Court then be in a position to recognize and strike down violations of constitutional limitations?

In these circumstances, an opinion advising in essence that the Act is constitutional is inappropriate.

It should be made clear that this opinion expresses no view upon the practical necessity of obtaining buildings of various kinds for use by the state, the merits of leasing as opposed to ownership, or the right of the state to issue bonds for the acquisition of necessary buildings if it does so consistent with the Constitution. These are matters of political, economic, social and general welfare significance belonging properly to the judgment of the Legislature and the Governor. The state may certainly issue $400,000,000 in bonds to finance building acquisitions if it could muster a two-thirds vote in each house of the Legislature and then garner the majority of votes cast on the issue in a general election. Const 1963, art 9, § 15.

The question is whether the complicated scheme contained in the Act—which creates an authority to acquire buildings and to issue bonds, which bonds are only payable from rentals, which rentals are payable by the state, which payments will be from general tax revenues—places sufficient distance between the state and the debt to allow the state to avoid going to the people for a vote. I think not. If such schemes are approved, the constitutional protections the people of our state have insisted upon in plain and simple language will be meaningless; when the state wishes to borrow it need not go to the people as required by the constitution, it need only create a new "authority" by a simple majority of the Legislature. It was to protect the people against just such borrowing that

the framers drafted and the people ratified art 9, §§ 12 and 15.

In addressing the question of the constitutionality of the Act, I will not be bound to the three artfully drafted questions proposed in the request for an advisory opinion. The Act as a whole, its intent and its effects, must be examined. When determining the constitutionality of legislation, courts must consider what may or might happen under the legislative grant of power. *State ex rel Public Institutional Building Authority v Griffith,* 135 Ohio St 604; 22 NE2d 200, 207 (1939). This is especially so when the legislation must be examined in a vacuum. Merely answering the three proposed questions and refusing to examine the Act as a whole would be an incomplete answer to the question of the constitutionality of the Act. It might also be misleading given the fact that the investing public may well rely on this Court's opinion in deciding whether to purchase the bonds and on what terms.

In these circumstances the correct approach to the problem is to ask what the Act authorizes and what is the legislative intent underlying it. In my view the Act is clearly a carefully planned and drafted legislative attempt to circumvent the constitutional limits of its power. Upon cutting through the artifice, however, what emerges is a scheme for empowering the state to contract a debt of up to $400,000,000 without going to the people for approval as required by art 9.

The legislation contains many provisions which lead to the conclusion that the building authority is actually an agency of the state despite formal declarations to the contrary.

Under § 2 of the Act the five members of the authority board of trustees are appointed by the

Governor with the advice and consent of the Senate. Under § 3(e) all facilities to be acquired by the authority must be approved by concurrent resolution of the Legislature for use by the state. Section 3(n) requires that the auditor general of this state, or his appointee, annually audit the authority's books. Section 4 allows the authority to acquire property by condemnation under 1911 PA 149 as amended. MCLA 213.21 *et seq.;* MSA 8.11 *et seq.* The purpose of the authority is to serve the state's needs for buildings and related facilities. § 1. The state and its agencies are the only lessees of the authority's property contemplated by the Act. § 6. All leases between the state and the authority must be approved by the State Administrative Board and by a concurrent resolution of the Legislature. § 7. The bonds issued by the authority must be approved by the Municipal Finance Commission under terms specified in the Act. § 8. The authority's bonds and interest thereon are exempt from all state and local taxes. § 8. The property owned by the authority and its income is exempt from all state and local taxes. § 11. Section 13 of the Act expressly declares that "the building authority will be performing an essential governmental function".

While § 2 of the Act declares that the authority is "a body corporate, separate and distinct from the state", it is our duty to cut through form and examine the substance of the relationship. *Gregory v Helvering,* 293 US 465; 55 S Ct 266; 79 L Ed 596 (1935). That duty is especially important when a transaction may be in violation of the Constitution. *Ayer v Commissioner of Administration,* 340 Mass 586; 165 NE2d 885 (1960).

Piercing through the formalisms of the Act reveals that in fact the sole purpose of the authority

is to serve the government's building needs and in substance it acts as an agent of the government, assigned to acquire space by issuing bonds. Thus the authority's debt is in reality the state's debt. See Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale LJ 234 (1958). See also *State ex rel Nevada Building Authority v Hancock,* 86 Nev 310; 468 P2d 333 (1970).

Even if one were to accept the formal recitations in the Act and consider the authority an independent entity, the Act must still be deemed an unconstitutional borrowing by the state.

The legislation creates an illusory entity in an attempt to divorce "the borrowing function from the paying function in what is essentially one integral transaction." *In the Matter of Constitutionality of Ch 280, Oregon Laws 1975,* 276 Or 135; 554 P2d 126, 129 (1976).

The essential function of the authority is to borrow money. The authority itself has no use for the buildings it will acquire; they are solely for use by the state. Under the Act even the authority's role as manager of the properties and conduit for the monies paid by the state and passing to the bondholders may disappear. §§ 6, 7 and 8.

"We agree that the [authority] is a separate entity. It can contract and issue bonds. It can sue and be sued. But these attributes are not enough to meet the present constitutional challenge. This is because we think that, viewing the project as a whole, the [authority] is nothing more than a mere intermediary to carry out only one purpose."

\* \* \*

"We hold that the creation of the [authority] to execute the 'contract of lease' is merely one phase of an integrated plan of which the substantial result is consti-

tutional evasion." *Ayer v Commissioner of Administration,* 340 Mass 586; 165 NE2d 885, 889, 892 (1960).

When its statutory function is evaluated, it becomes evident that the authority has no purpose other than to act for the state in a manner in which the state is prohibited from acting for itself.

The logic and justice of piercing through the artifice and holding the actual transaction to constitutional requirements is also supported by many commentators. See *e.g.,* Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L Rev 863 (1967), Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale LJ 234 (1958), Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377 (1957).

The building authority created by the act at bar differs fundamentally from operating authorities sustained in the past. See, *e.g., Nichols v State Administrative Board,* 338 Mich 617; 62 NW2d 103 (1954) (Mackinac Bridge); *Attorney General ex rel Eaves v State Bridge Commission,* 277 Mich 373; 269 NW 388, 270 NW 308 (1936) (Blue Water Bridge). In those cases the "revenue" bonds issued by the authority were payable from nongovernmental "users fees" such as tolls on bridges or highways. The state was not an integral part of the financing. *State ex rel Nevada Building Authority v Hancock, supra.*

As the Massachusetts Court stated in *Ayer, supra:*

"These entities [operating authorities] exist for more than a single, temporary purpose. They perform services for others than the sovereign itself." 165 NE2d 890.

In the instant case the authority is designed to serve the needs of the state and the state's general fund is the sole source of "revenue" to pay the principal and interest on the bonds. The state is contractually obliged to pay "rentals" which the bondholders know to be the only source of funds available for payment of the bonds unless the properties themselves are seized by the bondholders and sold. The bondholders are authorized by § 9 of the Act to bring a direct action against the state to compel performance.

Bonds dependent on the public treasury and in turn upon the general taxing power of the state for their sole source of payment are not revenue bonds, regardless of how they are labelled. The limited revenue bond exception to constitutional debt limitations is clearly inapplicable here. *Advisory Opinion re Constitutionality of 1973 PA 1 & 2*, 390 Mich 166, 174–178; 211 NW2d 28 (1973).

As was stated by the Oregon Supreme Court in a similar case:

"The stripping away of the formal paraphernalia that clothe the Authority and the transactions leads us to believe that a debt of the state is created within the meaning of the constitutional provision. Regardless of how the status of the Authority as a legal entity is viewed, its presence should be disregarded because its sole function is a mechanical one to effectuate a connection between the bondholders and the state in a manner which defeats the purpose of the debt limitation. To view the Authority as independent would be a victory of form over substance. The relationship in fact is one between the bondholders and the state; and the state's role in the arrangement goes beyond simply leasing the property from the Authority, for it is, in essence, retiring a debt which has been incurred on its behalf and which it has the sole responsibility to repay.

"Our conclusion may be subject to the criticism that

we have disregarded legal forms. However, this is the case anytime a court pierces form to arrive at the substance of an artifice. The use of the authority device contravenes the purpose of the constitutional debt limitation. If approved, there would no longer be any effective limitation. Use of the authority permits the discretionary incurrence of long-term obligations, which the state is in substance obligated to repay from general tax revenues, without limit and without control by the voters." *In the Matter of Constitutionality of Ch 280, Oregon Laws 1975,* 276 Or 135; 554 P2d 131–132 (1976).

The Act purports to require the state to pay rents under leases of up to 20 years. § 7. The majority today concludes that this contractually obligates future Legislatures to appropriate sufficient monies to comply with the lease. Without commenting on the ability of one Legislature to contractually bind another, future Legislature to appropriate certain amounts for specific purposes,[3] it is clear that the purpose of this provision of the Act is to provide comfort to bond purchasers. It is an effort to tie even more directly the public treasury of the state to the obligation to repay the bonds, while still retaining the authority as nominal obligor to evade constitutional restrictions.

The formal recitation in § 10 of the Act to the effect that the Act does not authorize an indebted-

---

[3] "One Legislature cannot obligate succeeding Legislatures to make appropriations. One Legislature may, within constitutional limitations, impose a contractual obligation upon the state which it is the duty of the state to discharge; but one Legislature cannot impose a legal obligation to appropriate money upon succeeding Legislatures." *Opinion of the Justices of the Supreme Judicial Court Given Under the Provisions of § 3 of Art VI of the Constitution,* 146 Me 183, 189–190; 79 A2d 753, 756 (1951).

*See also, Opinion of the Justices to the Senate,* 302 Mass 605; 19 NE2d 807 (1939), *State ex rel Fletcher v Executive Council of State of Iowa,* 207 Iowa 923; 223 NW 737 (1929), *State ex rel Public Institutional Building Authority v Griffith,* 135 Ohio St 604; 22 NE2d 200 (1939).

ness of the state contrary to the Constitution[4] may not be given precedence over the actual substance of the Act. *Constitutionality of Ch 280, Oregon Laws 1975, supra; Ayer v Com'r of Administration, supra; State v Griffith, supra.*

The clear intent and effect of the Act is to allow the state to borrow up to $400,000,000 to finance the acquisition of buildings. The Legislature, the prospective bond purchasers, and this Court all know that the only source of funds for payment of the bonds is the State treasury. Section 3(g) and § 8 of the Act. Calling these payments "rentals" and reciting the formula in § 10 is not a sufficiently potent incantation to ward off an examination of the vitals of the Act and the powers they contain.

It is not enough to argue that the state has always leased buildings privately and now will simply lease from the authority, paying current revenues for current services. Because the state may on occasion lease private sector space does not mean that a $400,000,000 debt financing scheme is permissible simply because it is denominated a "lease". The difference in substance between a common lease and what this Act authorizes must take precedence. Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377, 390–394 (1957).

The cases cited by my Brother KAVANAGH, while each is distinguishable on its facts, do indeed evidence a judicial willingness to accept at face value evanescent legislative recitations while disregarding the substance of the transaction. To the

---

[4] "This act shall not be construed or interpreted as to authorize or permit the incurring of indebtedness of the state contrary to the provisions of the state constitution."

extent these cases tend to support a finding of constitutionality of this Act, I would decline to follow them. The adage which denounces the exaltation of form over substance is too well known to require a recitation of authority.

The Act purports to authorize the state and authority to make any arrangement for disposition of the building upon retirement of the bonds. § 6. Thus, when the bonds are paid off, the authority may convey the building to the state for no additional consideration or for a nominal fee. Insofar as the Act authorizes such a scheme, it is in violation of the Constitution since this purported lease is a classic subterfuge for what is in fact debt financing of a capital asset. See, Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale LJ 234 (1958), and Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377 (1957), and cases cited therein.

Proponents of the Act make a great deal of the fact that the "true rental" required to be paid by the state is defined in the Act as "not [to] exceed the economic or market value to the state of the facilities to be leased", and is not explicitly tied to the cost of the buildings. § 1. Aside from the difficulties of assigning a realistic rental market value to buildings acquired or constructed specifically for state use and therefore unsuitable for most commercial purposes (for instance, hospitals, prisons and college buildings), it is not to be wondered that the authority will be able to comfortably pay its debt service out of "market value" rents since the authority is exempt from all taxes and has no use for profits, while other potential lessors in the market are subject to both pressures.

In the final analysis, the fact remains that the "rentals" paid by the state are intended to pay off the bonds used to acquire the buildings and are in reality debt service.

It is my opinion that it is the manifest intent and effect of this Act to evade constitutional limitations on debt. Because the legislation is an attempt to commit the power to tax the people of the State of Michigan to pay off a long-term debt without their direct approval, I conclude that it is unconstitutional.

I do not question the good faith of the Governor or the Legislature or their judgment on the necessity of obtaining buildings, or the right to obtain them on borrowed money. I would, however, require that they be obtained in a constitutional manner.