In re OPINION OF the SUPREME COURT RELATIVE TO the CONSTITUTIONALITY OF CHAPTER 239, SESSION LAWS OF 1977 (SDCL 31-4A).

No. 12304.

Supreme Court of South Dakota.

Aug. 26, 1977.

To his excellency, Richard F. Kneip, the Governor of the State of South Dakota.

Your letter of August 3, 1977, requests the opinion of the Justices of the Supreme Court upon important questions of law involving the exercise of your executive powers as Governor and upon matters which you state are of utmost solemn occasion relating to Chapter 239, Session Laws of 1977, creating the South Dakota Bridge Authority.

You request our opinion on three questions as follows:

"1. Would an act which authorizes the South Dakota Bridge Authority to issue bonds within the scope of ch. 239, Session Laws of 1977, violate Article XI, Section 8 of the South Dakota Constitution by permitting a diversion of highway funds for administrative and interest expenses of the Authority which are unrelated to the maintenance, construction and supervision of highways and bridges?

"2. Would an act which authorizes the South Dakota Bridge Authority to issue bonds within the scope of ch. 239, Session Laws of 1977, and which authorizes a continuing appropriation needed to retire said bonds, violate Article XII of the South Dakota Constitution? (a) Is a continuing appropriation constitutionally authorized? (b) Can a subsequent legislature decide not to continue the continuing appropriation? (c) Would a future 'continuing appropriation' require a two-thirds majority or a simple majority? (d) Is an impoundment of future highway funds authorized under Article XI, Section 8 of the South Dakota Constitution?

"3. Do the constitutional debt limitations found in Article XIII, Section 1, 2 and 16, impose any additional and independent limitations upon the use of constitutional state highway funds?"

This request for an advisory opinion is made pursuant to Article V, § 5 of the South Dakota Constitution which states in part:

"The Governor has authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions."

This court has ruled that this provision is disjunctive, presenting two situations in which an opinion can be given, that is, upon important questions of law involved in the exercise of his executive power and upon solemn occasions. In Re Opinion of the Judges, 1914, 34 S.D. 650, 147 N.W. 729.

Section 1 of Ch. 239, S.L. 1977, provides:

"There is created the South Dakota bridge authority, a body corporate and politic, for the purpose of effecting appropriate improvements on bridges on the state highway trunk system, including the construction of approaches and bridges, replacement of bridges, or repair, renovation, or upgrading of bridges as the Legislature shall from time to time authorize. The South Dakota bridge authority, hereinafter referred to as the 'authority', shall consist of seven members who shall be the members of the South Dakota building authority appointed by the Governor, by and with the consent of the Senate in accordance with §§ 5–12–1 and 5–12–2. The members of the authority shall take the oath of office as prescribed in § 5–12–3."

While the act contemplates the appointment of existing building authority members as members of the Bridge Authority, it is still for the Governor to appoint the members of the Bridge Authority and for these members to take a new oath as provided by SDCL 5–12–3. Under Article IV, § 3 of our Constitution, "[t]he Governor shall commission all officers of the state." According to the Secretary of State's office, no appointments have been made and no oaths have been taken by the members of the Bridge Authority, and such appointments would involve the exercise of the Governor's executive power.

Further, the Act provides for the appropriation of two million dollars a year from a special highway fund to finance the purposes of the Bridge Authority. Article IV, § 3 of our Constitution provides that:

"The Governor shall at the beginning of each session, and may at other times, give the Legislature information concerning the affairs of the state and recommend the measures he considers necessary."

Implementing this constitutional provision is SDCL 4–7–9 which reads:

"The Governor, through the bureau of finance and management, shall prepare and submit a budget report to the Legislature, and copies thereof shall be transmitted to each member of the Legislature, not later than the December first immediately preceding the session for consideration either with or without amendments and modifications by the Legislature."

■ We conclude that important questions of law exist involving the executive powers of the executive in that Ch. 239, S.L. 1977 requires executive action at this time on legislation considered to be questionable under our Constitution.

This may also fit the definition of a solemn occasion, though this is a nebulous term when applied to state government. How solemn an occasion warrants a decision is not too easily defined. We are not being invaded, the populace is not in insurrection, and no one will go hungry if bridges are not built and maintained; however, the legislation calls for the eventual expenditure of fifteen million dollars in state highway funds, plus the costs of issuing bonds and the payment of interest, which most taxpayers would consider a solemn occasion. Accordingly, we have concluded that your inquiry should be answered.

We will first consider the constitutional restrictions imposed on the state highway fund by Article XI, § 8 of the South Dakota Constitution.

We, of course, are handicapped in deciding this matter by not having the facts before us which would be available in a litigated case. For instance, we do not know the bonding authority, the interest rate to be paid on bonds or the cost of

procuring these bonds. In this situation, we do not feel bound to follow the usual rule of deciding the case "on the record" as there is no record. By the same token, we do not intend to operate in a vacuum but to use the knowledge common to all of us in dealing with bonding authorities. We know (whether you call it Judicial knowledge or otherwise) that bonding authorities require bonding counsel to clear a bond issue before it will be accepted and that the fee (based on similar bond issues) varies from one to one and one-half percent of the total bond issue. We also know that the bonding authority requires interest payments and (again, based on prior bond issues) that the interest varies from three to four and one-half percent depending on what its bonding counsel considers to be the risk involved.

Based on this knowledge and not on the record, we will proceed to examine the legislation in the light of Article XI, § 8 which provides that the special highway fund "shall be used exclusively for the maintenance, construction and supervision of highways and bridges of this state."

It should be noted that the South Dakota constitutional provision is more specific and restrictive than most state constitutional provisions on highway funds which generally simply state that the funds must be used for highway purposes, and then specifically list payment of bonds as a highway purpose. All of these constitutional provisions arose as a result of the enactment of the Hayden-Cartwright Act, 48 Stat. 993, § 12 of which limited federal highway construction money to those states that use state motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators "for the construction, improvement, and maintenance of highways and administration expenses in connection therewith, including the retirement of bonds for the payment of which such revenues have been pledged, and for no other purposes * * *." South Dakota did not choose to include the latter portion of this federal statute, and there is no provision in the constitutional amendment for the payment of bonding costs and interest.

The importance of this deletion from our Constitution must be emphasized. A survey of state constitutions reveals that only three states—South Dakota, Nevada and Michigan—declined to add this provision for the payment of bonding costs out of this special highway fund. We must assume that the Legislature took this action deliberately in submitting the amendment to the people. The provision for including "the retirement of bonds for the payment of which such revenues have been pledged" was in the federal statute and was stricken by the Legislature before submitting the amendment to the people.

In the case of *State v. Jones*, 1946, 74 N.D. 465, 23 N.W.2d 54, North Dakota reached the conclusion that certificates of indebtedness under a constitutional provision similar to that of South Dakota were proper; however, under a recent amendment in that state, a phrase was added to its constitution as follows:

"and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."

This decision went on to conclude that the debt limit provision of the North Dakota Constitution, similar to our Article XIII, §§ 1, 2 and 16, did not apply as long as the expenditures, including payments for costs of indebtedness, came from this special constitutional fund derived from gasoline and other motor fuel taxes, license plate revenue, etc. This decision emphasized that the income from motor fuel taxes was "frozen" for the sole purposes of "construction, reconstruction, repair and maintenance of public highways" and for "the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways." The decision rested on the fact that this latter phrase relative to the payment of obligations had been added in an amendment to the Constitution approved by the people in 1940.

The conclusion is inevitable that without this amendment the funds derived from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes would have been frozen

exclusively for the construction, reconstruction, repair and maintenance of public highways, and they would not have been available to pay the costs of indebtedness or bond issues.

We reach a similar conclusion in answering the question posed as to Ch. 239, S.L. 1977. The history of Article XI, § 8 of our Constitution, as indicated by our failure to follow the federal statute and include the costs of bond issues as a legitimate expenditure out of this highway fund and the cases of the South Dakota Supreme Court since the enactment of that constitutional provision, clearly indicates that this is a restricted and impressed fund created by the Constitution that prevents the use of the funds described in the Article for payment of any obligation of the state other than those described in the Article. See *State v. Youngquist*, 1943, 69 S.D. 423, 11 N.W.2d 84, where the Supreme Court struck down a measure which attempted to transfer funds of the special highway fund into the general fund for the payment of miscellaneous appropriations. Also, see *State v. Wilder*, 1950, 73 S.D. 330, 42 N.W.2d 891, where an attempt was made to divert motor fuel taxes to reduce the rural credit bond and interest, and, again, the court stated that this was an improper diversion of the special highway fund. As stated in *State v. Youngquist*, supra,

"Legislative authority over these funds is limited by the amendment to the enactment of administrative measures. The Legislature may establish new agencies or authorize existing officers, boards or commissions to use the funds for highway administration, maintenance, construction and supervision. It may change these agencies from time to time and it may vary the administrative procedure." 69 S.D. at 427, 11 N.W.2d at 86.

The question may be raised whether bond issues are "administrative" measures. Section 12 of Ch. 239, S.L. 1977 provides:

"To accomplish projects of the kind listed in section 6 of this Act, the authority shall possess the power to issue up to fifteen million dollars of special obligation revenue bonds in such amounts as the authority may determine necessary for the purpose of financing the construction, replacement, repair, renovation, or upgrading of bridges and approaches on the state highway trunk system; to refund and refinance the same from time to time when in the public interest to do so; and pledge any and all income of such authority, which pledge shall not exceed two million dollars in annual payments, or the amount of moneys needed to amortize fifteen million dollars in the principal amount of such bonds, whichever is lesser, to secure the payment of such bonds. All such bonds shall be subject to the provisions of sections 13 to 17, inclusive, of this Act."

Section 23 of Ch. 239, S.L. 1977 provides:

"The department of transportation is hereby authorized to enter into contracts for one or more years with the authority under which the department agrees to make timely payments sufficient to amortize the principal and interest of any bonds issued by the authority pursuant to such contractual agreement. The board of transportation is hereby authorized to obligate the amount of funds necessary to amortize up to fifteen million dollars in the principal amount of any bond issue or two million dollars annually, whichever is lesser, or so much thereof as may be necessary from the state highway fund, for amortization of any bonds it authorizes the authority to issue pursuant to its contract. Upon signing such contract, the authority and the department of transportation shall notify the state treasurer. The state treasurer, when transferring seven-eights of the motor fuel tax fund to the state highway fund pursuant to § 10–47–73, shall transfer the amount of moneys required to meet any contractual obligation between the authority and the department of transportation to the public bridge fund in a timely manner calculated to enable the authority to meet its contractual obligations. Such transfer to the public bridge fund shall have precedence over any transfer of funds to the state highway fund, and, in the event the funds in the motor fuel tax fund available for transfer to the state highway fund are insufficient to cover the terms

of such contractual agreement, such a transfer shall be made as soon as funds become available until all contractual obligations have been met. The sum of two million dollars, or so much thereof as may be necessary, is hereby annually appropriated from the state highway fund for the purposes described in this section."

This seems to go far beyond the enactment of administrative measures described in *Youngquist*. It authorizes the Authority to "issue up to fifteen million dollars of special obligation revenue bonds," "to refund and refinance the same from time to time," and to "pledge any and all income of such authority, which pledge shall not exceed two million dollars in annual payments * * *." Figuring one percent cost for issuance of the bonds and four percent cost for interest on the bonds, there would be roughly $750,000 diverted from the special highway fund during the first year, and it would not be for the "maintenance, construction and supervision of highways and bridges of this state." Without an amendment such as that provided in the Constitutions of most states which includes a phrase "including the retirement of bonds for the payment of which such revenues have been pledged," this would be a diversion, and a substantial diversion, from the special highway fund.

There appears to be no doubt that the funds appropriated for the purpose of financing the Authority's bonding authority would come from special highway funds. Section 15 of the Act refers to the state highway fund. Likewise, Section 23 of the Act refers to this fund, and the closing sentence states:

"The sum of two million dollars, or so much thereof as may be necessary, is hereby annually appropriated from the state highway fund for the purposes described in this section."

Finally, § 17 of the Act provides:

"Nothing in this chapter shall be construed to authorize the authority or any department, board, commission, or other agency to create an obligation of the state of South Dakota within the meaning of the Constitution."

This makes it clear that no general funds are to be appropriated for paying these obligations, and it leaves only the special highway fund available to finance the purposes of this Act.

■ Given the explicit instructions of the Constitution that this money is to be used exclusively for the "maintenance, construction and supervision of highways and bridges of this state", the history of the enactment of this constitutional provision and the Supreme Court cases decided since the enactment of the provision, we conclude that the diversion of roughly thirty-seven percent of the first annual appropriation from the special highway fund for the payment of bond issuance costs and interest would be contrary to the clear intent of the people in enacting this amendment in 1940.

In view of our decision here, we find no necessity for answering the questions relative to the interplay between Article XI, § 8, and Article XIII, §§ 1, 2 and 16. We simply advise that it is our considered opinion that Ch. 239, S.L. 1977 is unconstitutional under Article XI, § 8, as a diversion of a special highway fund for purposes other than the "maintenance, construction and supervision of highways and bridges of this state."

Respectfully submitted this 26th day of August, 1977.

FRANCIS G. DUNN
Chief Justice

ROGER L. WOLLMAN
Associate Justice

LAWRENCE J. ZASTROW
Associate Justice

DONALD J. PORTER
Associate Justice

ROBERT E. MORGAN
Associate Justice

WOLLMAN, Justice (concurring specially).

Although I agree with the answer given by my colleagues with respect to the ques-

tions raised in the request for an advisory opinion, I would respectfully have declined to render the requested opinion.

The questions of law set forth in the request are, of course, important; indeed, we hold that the Act in question is unconstitutional, at least in part. The questions of law regarding the exercise of the Governor's executive authority, however, are not such as would warrant us in answering the request. Section 1 of the Act, Chapter 239, Laws of 1977, provides that the members of the South Dakota Building Authority shall constitute the membership of the Bridge Authority. The Governor is given no discretion in the matter; if he must do anything it is to perform the ministerial act of signing the appointments. Once the members are appointed, the Governor's duties under the Act have been completed, save for the matter of reporting the budget to the legislature. There again, if the Act provides for the appropriation of two million dollars annually, then it would appear that the Governor has no choice but to include such appropriation within his annual budget report to the legislature. Whether the Act is unconstitutional in whole or in part has nothing to do with this quasi-ministerial act. The legislature having commanded the appropriation of money, the Governor must include it within his budget.

Whether the members of the Bridge Authority should proceed to carry out their statutory authority to issue bonds under the provisions of the Act is, of course, a most important question. Had an attempt been made to issue the bonds, then any taxpayer interested in challenging the constitutionality of the Act could have filed suit to restrain the Authority and the matter could have been resolved in adversary proceedings, a procedure that has been suggested in other cases. See *In re Opinion of the Judges*, 85 S.D. 390, 182 N.W.2d 849; cf. *McFarland v. Barron*, 83 S.D. 639, 164 N.W.2d 607. Granted that such a procedure would have been more costly and time consuming, in the absence of an emergency situation, and none is here alleged, important questions of constitutional law involved in the exercise of a public agency's authority to spend public funds should be answered only after a full adversary hearing.

From what I have already said it should be clear that I do not consider that the exercise of the Governor's executive powers with respect to his duties under the Act could be considered a solemn occasion within the meaning of Article V, Section 5 of the Constitution. True, the potential expenditure of some fifteen million dollars, together with interest and costs, might not be considered by all taxpayers, especially those not directly benefitted thereby, to be an occasion of levity and rejoicing, but it seems to me that we trivialize the meaning of the term if we characterize the instant situation as constituting a solemn occasion. I would restrict the definition of "solemn occasion" to include those situations where the public fisc is in jeopardy, where the general welfare of the citizens of the state is threatened, where the maintenance of order demands immediate executive action, and other occasions of similar gravity when the welfare of our citizenry is so imperiled that it would give us pause not to answer a request for an advisory opinion. This is not such an occasion, and accordingly I would respectfully decline to answer the questions raised.

I do not question the concern that the Governor must understandably share regarding the constitutionality of the Act; cf. *Opinion of the Supreme Court*, 87 S.D. 399, 209 N.W.2d 668, nor do I overlook the fact that on other occasions I would have answered a request that my then colleagues declined to answer. See *In re Opinion of the Judges*, supra. Rather, I express these views to emphasize my opinion that we should reserve answer to requests for advisory opinions to those situations in which the exercise of the Governor's executive power will result in immediate consequences having an impact on the institutions of state government or on the welfare of the public and which involve questions that cannot be answered expeditiously through usual adversary proceedings.

Notwithstanding my personal opinion that the request for an advisory opinion should not have been answered, because I agree with the Court's opinion regarding the answer given I join in that portion of the opinion that holds that the Act would result in the unconstitutional diversion of highway funds.

Respectfully submitted this 26th day of August, 1977.