**To His Excellency Harvey WOLLMAN, the Governor of the State of South Dakota.**

**No. 12529.**

Supreme Court of South Dakota.

July 27, 1978.

The letter of then Governor Richard F. Kneip, dated July 5, 1978, requested the opinion of the Justices of the Supreme Court upon questions of law as to matters which were stated to be of solemn occasion relating to tax increment financing, 1978 S.D.Sess.L. ch. 91.[1]

The Act allows the increased tax revenues generated by community redevelopment projects to pay for the public costs of such projects. These revenues are placed in a special fund which is used to repay public costs.

Tax increment financing is initiated as outlined in § 7 of the Act. After notice and a public hearing, the planning commission or committee of a municipality recommends creation of a tax increment district. At least twenty-five percent of this district must be a "blighted area" as defined in § 2 of the Act. Improvement of the area must be "likely to enhance significantly the value of substantially all of the other real property in the district," § 7(4)(b). The aggregate assessed value of the taxable property in the district plus all other existing districts in the municipality must not exceed a specified percentage of the total taxable property in the municipality, § 7(4)(c). If the planning body finds the above conditions to exist, it passes a resolution and submits a detailed project plan to the governing body of the municipality for its approval, §§ 7(5), 7(6).

Upon creation of a tax incremental district, its tax incremental base must be determined, § 10. The State Department of Revenue determines this figure, which is the original full aggregate assessed value of the taxable property in the district, §§ 11–13. The Department of Revenue thereafter gives notice annually of the current value of the taxable property in the district, § 15, and computes the tax increment, in accordance with § 4, by using the following formula:

$$\text{Total taxes levied on all taxable property within the tax incremental district} \times \frac{\text{Current Assessed Value Less Tax Incremental Base}}{\text{Current Assessed Value}}$$

Any positive tax increments (amounts derived by the above formula) are allocated to the municipality and placed in a special fund. This continues until the program terminates or until all project costs are paid, § 16. In no event can tax increments be allocated to the municipality more than fifteen years after the last expenditure identified in the plan has been made, § 16(2).

A municipality is authorized to pay for the improvements from the tax increment fund, from general funds, out of the proceeds of municipal improvement bonds, SDCL 9–44, revenue bonds, SDCL 9–54, or tax incremental bonds or notes. See § 20. Tax incremental bonds are payable solely from the special funds of the tax incremental district, §§ 21–24. The city is also authorized to grant a lien on public improvements financed by the bonds or to provide other additional security, § 25.

Governor Kneip requested our opinion on six matters, as follows:

1. Would the financing of municipal development or redevelopment projects through the use of tax increment fi-

---

1. Hereinafter referred to as "the Act." References to section numbers are also to this chapter.

nancing violate the public purpose doctrine embodied in Article XI, § 2 of the South Dakota Constitution?

2. Would the financing of municipal development or redevelopment projects through the use of tax increment financing contravene the constitutional debt limit established in Article XIII, § 4 of the South Dakota Constitution?

3. Would the financing of municipal development or redevelopment projects through the use of tax increment financing constitute unlawful delegation of legislative authority in violation of Article III, § 1 of the South Dakota Constitution?

4. Would the financing of municipal development or redevelopment projects through the use of tax increment financing violate the equal protection, uniform operation of laws, and privileges and immunities guarantees of Article VI, § 18 of the South Dakota Constitution?

5. Would the financing of municipal development or redevelopment projects through the use of tax increment financing violate substantive due process guarantees of Article VI, §§ 2 and 13 of the South Dakota Constitution?

6. Would the financing of municipal development or redevelopment projects through the use of tax increment financing constitute a nonuniform system of taxation in violation of Article VI, § 17 or Article XI, §§ 2 and 10 of the South Dakota Constitution?

This request for an advisory opinion was made pursuant to Article V, § 5 of the South Dakota Constitution, which states in relevant part: "The Governor has authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions."

Governor Kneip's letter of July 5 did not state that the questions propounded "involved . . . the exercise of [the Governor's] executive power." We find that

they are not so involved. The Governor's only function under the Act is to receive an annual report from the State Planning Bureau. No action the Governor proposed to take would be affected by our answer. The Governor is not required to exercise his executive power under this Act.[2]

This inquiry is in this respect unlike others which we have answered. These have involved at least some contemplated action by the Governor. *See In re Opinion of Supreme Court,* S.D., 257 N.W.2d 442 (1977) (Governor to appoint members of bridge authority); *In re Opinion of Supreme Court,* 87 S.D. 156, 204 N.W.2d 184 (1973) and *In re Opinion of Justices,* 87 S.D. 114, 203 N.W.2d 526 (1973) (Governor's power under executive reorganization); *In re Opinion of Judges,* 61 S.D. 107, 246 N.W. 295 (1933) (Duty of Governor to recommend reapportionment to legislature); *In re Opinion of Judges,* 58 S.D. 72, 234 N.W. 671 (1931) (Governor to assume chairmanship of Department of Rural Credits); *In re Opinion of Judges,* 38 S.D. 635, 162 N.W. 536 (1917) (Governor's power to appoint members of Rural Credit Board). We refused to issue an advisory opinion where no executive question was involved. *In re Construction of Constitution,* 3 S.D. 548, 54 N.W. 650 (1893).

Two inquiries which we have answered involved minimal exercise of executive power, *In re Opinion of Judges,* 61 S.D. 107, 246 N.W. 295 (1933) and *In re State Census,* 6 S.D. 540, 62 N.W. 129 (1895). These cases are, however, distinguishable on their facts from the present inquiry. They involved the reapportionment of the legislature, which would affect the entire political system of this state. The legislature was either in session, or soon would be, and the Governor had to know at once whether he would recommend reapportionment. Executive action was contemplated which required an answer to the Governor's questions.

**2.** The duties of the Department of Revenue under the Act are not such as require exercise of executive power as the term is employed in Art. V, § 5 of the South Dakota Constitution.

In the present fact situation, there is no contemplated executive action. According to the letter of July 5, the Governor will neither take action nor refrain from taking action based on our answer. The subject matter of this inquiry does not affect the entire governmental structure to the same degree as reapportionment. It also appears to us that alternative remedies exist, and although they may involve some expense and delay, they are not sufficiently inadequate so as to justify circumventing the judicial process. We believe that the need for a determination is not so urgent as to require our opinion at this time. No statute, the present Act included, needs a determination of its constitutionality in order to render it effective. If some person is aggrieved by municipal action under this Act, he may pursue his remedies through the usual judicial channels.

We conclude, therefore, that the facts presented do not rise to the level of solemn occasion necessary before this court is constitutionally empowered to render an advisory opinion to the Governor. We therefore respectfully decline to answer the questions presented in Governor Kneip's letter of July 5, 1978.

Respectfully submitted this 27th day of July, 1978.

FRANCIS G. DUNN
Chief Justice

ROGER L. WOLLMAN
Associate Justice

LAURENCE J. ZASTROW
Associate Justice

DONALD J. PORTER
Associate Justice

ROBERT E. MORGAN
Associate Justice